UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,      )
                              )          Criminal Action
          Plaintiff,           )          No. 19-04532-DHH
                              )
v.                             )
                              )
ZAOSONG ZHENG,                 )
                              )
          Defendant.           )
                              )
```


BEFORE THE HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE


DETENTION HEARING

December 30, 2019



United States District Court
One Courthouse Way
Boston, Massachusetts 01608




Digitally recorded and
stenographically transcribed by:
Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:
     Benjamin Tolkoff
3    United States Attorney's Office MA
     1 Courthouse Way
4    Suite 9200
     Boston, MA 02210
5    617-748-3183
     benjamin.tolkoff@usdoj.gov

6

7    On Behalf of the Defendant:
     Brendan O. Kelley
8    Federal Defenders Office
     51 Sleeper Street, 5th Floor
9    Boston, MA 02210
     617-223-8061
10   brendan_kelley@fd.org

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3    before the Honorable David H. Hennessy, United States
 4    Magistrate Judge, United States District Court, District of
 5    Massachusetts, One Courthouse Way, Boston, Massachusetts, on
 6    December 30, 2019.)
 7              COURTROOM CLERK:  Today is December 30, 2019.  We're
 8    on the record in the matter of United States v. Zaosong Zheng.
 9    It is docket 19-MJ-04532.  Would counsel please identify
10    themselves for the record.
11              MR. TOLKOFF:  Good morning, Your Honor.  Ben Tolkoff
12    for the United States.
13              THE COURT:  Good morning.
14              MR. KELLEY:  Good morning, Your Honor.  Brendan Kelley
15    for Zaosong Zheng, who is seated to my right.
16              THE COURT:  Good morning.  Swear the interpreter.
17              (Interpreter duly sworn.)
18              THE COURT:  Good morning.  All right.  This is a
19    continued detention hearing.  I basically allowed the
20    government's motion to reopen the detention hearing after
21    granting the defendant release on conditions which included a
22    $100,000 bond secured by $15,000 in cash, which I understand
23    was posted, and the defendant's ability to live with the person
24    who is referred to as his uncle, which I think might be in
25    jeopardy; I don't know.  But the reason for granting the motion
```

1   was because when a home inspection was done at 400 Brookline

2   Avenue, Unit 8A, all of the defendant's belongings were packed,

3   and the shelf in the bedroom where the defendant slept was

4   empty, the defendant's belongings were either in plastic bins,

5   clear plastic bins or they were in suitcases, and it appeared

6   that it was the defendant's intention to leave the United

7   States.  And there's a suggestion at least in the evidence that

8   the defendant was not planning to return to the United States

9   despite having a return to the United States on December 29,

01:32 10   2019, according to his flight itinerary.

11        So I allowed the motion.  I received additional

12   evidence, including the affidavit of Special Agent Kara Spice

13   of the FBI.  I was prepared to rule on December 20, and at

14   least the defendant, if not both sides, asked for an

15   opportunity to provide additional information.  I've granted

16   that motion.  So that's where we are.

17        Mr. Tolkoff, I'll start with the government.  Is there

18   additional evidence you want to present?

19        MR. TOLKOFF:  Your Honor, with leave of the court, I

01:33 20   would ask to recall Special Agent Spice just very briefly.

21        THE COURT:  Okay.  Go ahead.

22        KARA SPICE, Sworn.

23        COURTROOM CLERK:  Please state and spell your name for

24   the record.

25        THE WITNESS:  Kara, K-a-r-a.  Last name Spice,

1     S-p-i-c-e.

2              MR. TOLKOFF:   Thank you, Your Honor.

3     DIRECT EXAMINATION BY MR. TOLKOFF:

4     Q.   Special Agent Spice, when we were last on the record in

5     this matter, we spoke about a gentleman by the name of Jialin

6     Li.   Do you recall that?

7     A.   Yes.

8     Q.   And Mr. Li is the former roommate of Mr. Zheng; is that

9     correct?

01:34 10   A.   That's correct.

11    Q.   And that is at 400 Brookline Ave., Apartment 8A, in

12    Boston; is that correct?

13    A.   Yes.

14    Q.   Between the 20th of December and today have you had an

15    opportunity to conduct a further interview of Jialin Li?

16    A.   Yes, I have.   I interviewed Mr. Li on December 23rd, last

17    week, Monday, 2019.

18    Q.   And at our last appearance there was some ambiguity as to

19    how Mr. Zheng got to the airport on December 10, 2019.   Do you

01:37 20   recall that?

21    A.   Yes.

22    Q.   Did you speak with Mr. Li about that issue?

23    A.   Yes, I did.

24    Q.   And what did Mr. Li say?

25    A.   Mr. Li stated that on December 10, as his roommate

```
 1    Mr. Zheng did not have a cell phone or any way of
 2    communicating, he called an Uber with his cell phone, Mr. Li's
 3    cell phone, and rode in the Uber along with his luggage to
 4    Boston Logan Airport on December 10.  Mr. Zheng entered the
 5    customs and border patrol area, and Mr. Li waited for him
 6    outside in the terminal with his luggage.
 7    Q.   And that luggage, was that the same luggage that was found
 8    at Apartment 8A, 400 Brookline Ave. when that residence was
 9    searched by FBI agents?
01:37 10    A.   Yes.  Mr. Li also indicated there was two larger suitcases
11    as well as a smaller suitcase approximately 26 inches that he
12    used as a carry-on.  He believed that Mr. Zheng had that.
13    Q.   In addition to the luggage, to your knowledge, based on
14    the information you received from Mr. Li, how many keys were
15    there for Apartment 8A at 400 Brookline Ave.?
16    A.   Mr. Li indicated that there were two keys for Apartment
17    8A.
18    Q.   And where were those keys, based on what you learned from
19    Mr. Li?
01:38 20    A.   Mr. Li said that he had both apartment keys.  Mr. Zheng
21    left his apartment key with him, and then Mr. Li gave it to
22    that additional --
23    Q.   I'm sorry, if I could just clarify one thing.  When you
24    say that Mr. Zheng left the apartment key with him, "him" in
25    that statement is Mr. Li; is that correct?
```

A.    Mr. Li, yes.

Q.    Thank you.  I apologize.  I cut you off.

A.    And then Mr. Li gave that second key to Zheng's former --
to the friend that was staying in the apartment that was
noticed upon the FBI's arrival on the search warrant execution.

Q.    All right.  Now, the government received information this
morning that Mr. Zheng may be returning to 400 Brookline Ave.,
Apartment 8A; is that correct?

A.    Yes.

Q.    And in addition to that, that Mr. Zheng may be the only
occupant going forward.  Is that a fair assessment of the
information that was received as of just this morning?

A.    Yes.

Q.    Is that the information that FBI agents learned from
apartment management when it was initially contacted about a
week and a half ago?

A.    That does conflict the information that the FBI was in
possession of from an interview with Ms. Bates, the apartment
manager, on December 13, 2019.

Q.    And so in what ways did it conflict with the information
provided by Ms. Bates?

A.    Ms. Bates, as well as Mr. Li in the interview I conducted
last Monday, indicated that Mr. Li came down on the 11th of
December to indicate that he, Mr. Li, and Mr. Zheng would no
longer be living in the apartment starting January 1, 2020.

```
 1    Q.   And based on the information from both Mr. Li and

 2    Ms. Bates, would anyone else be living in that apartment?

 3    A.   Yes.  A gentleman would be taking over the lease and would

 4    be moving in with his family and he would be the sole lessee

 5    for the apartment.

 6    Q.   All right.  And was FBI provided any documentation

 7    corroborating this?

 8    A.   Yes.

 9    Q.   Okay.  Do you happen to have that?

10    A.   I do.

11         MR. TOLKOFF:  If I may approach, Your Honor?

12         THE COURT:  Yes.

13         MR. TOLKOFF:  For the record, I'm providing the agent

14    what is titled as Apartment Lease for the Longwood Galleria.

15    Q.   And Special Agent Spice, do you recognize that page?

16    A.   Yes, I do.

17    Q.   And could you just tell us what that says.

18    A.   It is a piece of paper that was photographed by or

19    provided by Ms. Bates to the FBI.  It's a handwritten note that

20    says, "Brother is taking over lease as of 1-1-20, January 1,

21    2020, until lease expires, and then he will sign a new lease

22    with us as for another year.  The individual has a Harvard ID

23    card and is named Nixin (phonetic) Wang," and it bears a phone

24    number as well as an email address.

25         MR. TOLKOFF:  And Your Honor, that's a lease
```

           1   agreement.  It has a lot of personal identifying information,
           2   so I would not want to admit it in the public record because it
           3   could potentially be compromising to the individual who signed
           4   it.  A copy has been provided to defense counsel.  I can
           5   provide another copy.
           6           THE COURT:  I would appreciate it.  I don't recall
           7   receiving a copy of this.
           8           MR. TOLKOFF:  Okay.
           9           THE COURT:  Mr. Kelley, I can give you a few minutes
01:43   10   after this direct if you want to go through that in case you
          11   have questions for the witness.
          12           MR. KELLEY:  That's fine.
          13           THE COURT:  Okay.
          14           MR. TOLKOFF:  Your Honor, I have no further questions
          15   of the witness at this time.
          16           THE COURT:  All right.
          17   CROSS-EXAMINATION BY MR. KELLEY:
          18   Q.   Special Agent Spice, let me start off with the last issue.
          19   Have you spoken with the Galleria Apartments since speaking
01:43   20   with Ms. Bates?
          21   A.   No, I have not personally.  We did attempt to contact her
          22   or someone that works there this morning.  As of court --
          23   Q.   Okay, okay.
          24   A.   -- return the call.
          25   Q.   Ms. Bates is an assistant property manager, is she not?

```
 1   A.    I believe that's her title.
 2   Q.    And the title of property manager is Jack Harold.  Does
 3   that sound familiar?
 4   A.    I'd have to review the documents to be --
 5   Q.    Okay.
 6   A.    The lease is actually signed by Ms. Bates on August 15,
 7   2019 for the Druker Company.  Are you seeing this on the last
 8   page of the lease?
 9   Q.    I guess I'm asking do you have any information that that's
10   who the property manager is, not the assistant property
11   manager, but essentially Ms. Bates's boss.
12   A.    The documentation that we have on Ms. Bates doesn't
13   indicate that.  The actual lease on August 16, the day they
14   signed the lease, of 2019, she is the TDC Holding Corporation
15   Manager, Assistant Property Manager, Bates."  I don't see a --
16         THE COURT:  Do you have any information that Jack --
17   is it Harold?
18         MR. KELLEY:  I believe it's Harold, Judge.
19         THE COURT:  -- is the property manager?  Whether it's
20   that document, do you have any information?
21         THE WITNESS:  No.  I only have --
22         THE COURT:  Okay.  That's the answer.
23         MR. KELLEY:  Yes.
24         THE COURT:  Go ahead.
25   Q.    And with respect to Ms. Bates, when you spoke with her was
```

1    she on vacation?  Was she here in Boston?

2    A.   I didn't -- I didn't attempt to make the call, but it's my

3    understanding her voicemail says that she's out of the office

4    until January 7.

5    Q.   Okay.  And another agent contacted her, correct?

6    A.   Correct.

7    Q.   Okay.  You don't recall, though, whether that took place

8    here in Boston, or was it just via phone?  Did someone visit

9    her?

01:46 10   A.   Today?

11   Q.   Ms. Bates, when that interview that you're describing was

12   conducted, was that by phone or --

13   A.   No.  It was in person.

14   Q.   In person?

15   A.   On January -- sorry.  December 13.

16   Q.   Okay.  Was that here or was that in Florida, or do you not

17   know?

18   A.   It was my understanding it was in Boston.

19   Q.   Okay.  In any event, you testified that her voicemail

01:46 20   indicates that she's out of the office until January sometime;

21   is that right?

22   A.   Correct, her voicemail today.

23   Q.   Okay.  You don't have any information that Mr. Nixin

24   (phonetic) Wang actually signed a lease for this unit?

25   A.   I don't have any other information besides what was

1    provided by Ms. Bates on January -- December 13.

2    Q.   Okay.  With respect to Mr. Li, you testified that in this

3    most recent interview that you conducted with him that he

4    admitted that he had gone to the airport, correct?

5    A.   Correct.

6    Q.   Okay.  Previously in your affidavit that you filed in this

7    case, he denied going to the airport; is that correct?

8    A.   That is what he told the interviewing agents prior to our

9    (inaudible) last week.

01:47 10   Q.   Okay.  Your interview with Mr. Li, where did that take

11   place?

12   A.   In Boston.

13   Q.   Okay.  In person?

14   A.   In person.

15   Q.   At the apartment?

16   A.   No.  It was at a coffee shop.

17        THE COURT:  Sorry.  Are we talking about this

18   interview where he admitted going to the airport?

19        MR. KELLEY:  Yes.

01:48 20        THE COURT:  Okay.  When is that interview?

21        THE WITNESS:  I'm sorry.  So he was interviewed upon

22   the execution of the search warrant at the apartment.

23        THE COURT:  Right, right.

24        THE WITNESS:  And last Monday, the 23rd, I interviewed

25   the person at a coffee shop in Boston.

```
 1   BY MR. KELLEY:
 2   Q.   Okay.  Now, as we sit here today, do you know the
 3   whereabouts of Mr. Li at this time?
 4   A.   He was scheduled to fly home to China this last weekend.
 5   Q.   And did he?
 6   A.   I believe so.
 7   Q.   Okay.  Is that consistent with what he in his interviews
 8   had told you was his plan, or was this a surprise that he flew
 9   back to China?
10   A.   It's consistent.
11   Q.   Okay.  If I recall correctly, his visa was about to expire
12   in January.  Is that accurate?
13   A.   Correct.
14   Q.   Okay.  You testified that he admitted being at the airport
15   with Mr. Zheng's two bags, correct, two large suitcases and
16   another small bag, correct?
17   A.   Another suitcase, two suitcases --
18   Q.   Another suitcase, okay.  And in your discussion with
19   Mr. Li, you said that he admitted that he had Mr. Zheng's keys
20   to the apartment, correct?
21   A.   Correct.
22   Q.   Those keys were given to another individual, correct --
23   A.   Yes.
24   Q.   -- according to Mr. Li?
25   A.   According to Mr. Li.
```

Q.   And in your discussion with Mr. Li, did you touch on
whether or not that was a temporary sort of an Airbnb type of
relationship that this individual was going to stay in the
apartment?

A.   Mr. Li explained that actually the individual -- I'd have
to look at the name -- was actually friends with Mr. Zheng and
was staying there temporarily for two weeks while he waited for
his lease to start on his apartment within the same building.

Q.   Okay.  And the individual that Mr. Zheng was describing,
am I correct that your testimony was that that's the same
individual that was in the unit when the FBI went there on
December 17?

A.   Correct, that's how we discovered --

Q.   Okay.  According to your affidavit, that's an individual
named Weihai Liu, correct?

A.   I'd have to look it up but --

          THE COURT:  Can you direct us to a paragraph,
Mr. Kelley, so we're not hunting around for it.

          MR. KELLEY:  Yes, I believe it's document 27-1,
paragraph 3.

          THE COURT:  Thank you.

          THE WITNESS:  Paragraph 3?  I'm sorry.

          MR. KELLEY:  Paragraph 3 of your affidavit.

          THE COURT:  Fourth line down after "December."

          THE WITNESS:  Yes, I'm sorry.

1    Q.    Okay.  And so that is the individual that Mr. Li said that

2    he gave Mr. Zheng's keys to, correct?

3    A.    Yes.

4    Q.    And the information that Mr. Li said was that Mr. Liu was

5    going to stay until his own lease started in the same building.

6    Is that accurate?

7    A.    Yes.

8    Q.    Okay.  And going back to your testimony from one of our

9    previous hearings, you participated in the search of this

01:52  10   apartment on December 17.  Is that accurate?

11   A.    No, I did not.

12   Q.    No?  Okay.  You're aware, though, that agents did search

13   the apartment on that date, correct?

14   A.    Yes.

15   Q.    Okay.  And during that time agents observed some

16   additional material that belonged to Mr. Zheng in the

17   apartment, correct?

18   A.    Correct.

19   Q.    In addition to these two suitcases and small suitcase that

01:52  20   Mr. Li had at the airport, correct?

21   A.    Yes.

22   Q.    Okay.  Additional items that remained in the room was a

23   number of shoes.  Do you recall that?

24   A.    I don't recall that.

25   Q.    Okay.  There were some bins that had some items of

1    Mr. Zheng's; is that right?

2    A.   I observed some plastic bins, what appeared to be a

3    laundry basket, through photographs.

4    Q.   Through photographs, okay.  And those are photographs that

5    were taken by the FBI --

6    A.   Yes.

7    Q.   -- is that right?  Okay.  And agents also searched these

8    bags, I presume, these two suitcases and small suitcase that

9    were at the airport, right?

01:53 10   A.   Yes.

11   Q.   Inside there was clothing?

12   A.   Clothing among other materials.

13   Q.   Okay.  And in addition to the clothing, were there

14   photographs; were there other sort of mementoes that were in

15   the bag that you're aware of?

16   A.   As far as the specific items detailed, the pictures that I

17   observed were overall photos that appeared --

18   Q.   Okay.  Clothing basically?

19   A.   Clothing, a breast pump bag and other things.

01:55 20        MR. KELLEY:  Okay.  I don't believe I have anything

21   further at this time.

22        THE COURT:  Okay.  Do you have anything else?

23        MR. TOLKOFF:  Just very briefly, Your Honor.

24        THE COURT:  Okay.

25   REDIRECT EXAMINATION BY MR. TOLKOFF:

1   Q.   Special Agent Spice, when Mr. Kelley asked about remaining

2   items that appeared to belong to Mr. Zheng in the apartment,

3   Apartment 8A, based on your review of the evidence and your

4   discussion with agents who conducted this search, was that a

5   lot of stuff?  Or what are we talking about?  Would it fit into

6   a shoebox?  Would we need a refrigerator-size box to fit the

7   number of things that appeared to belong to Mr. Zheng that

8   remained in that apartment?

9   A.   It was minimal.  It was more household goods.  Probably

01:55  10   could have fit in a large to medium suitcase, from the

11   photographs.

12           MR. TOLKOFF:  Okay, thank you.

13           THE COURT:  Agent Spice, has Beth Israel Deaconess

14   Medical Center been informed of the facts of this case?

15           THE WITNESS:  Yes.

16           THE COURT:  To your knowledge have they indicated

17   whether the defendant is going to be terminated?

18           THE WITNESS:  Yes, sir.  So as of before the holiday

19   his position was terminated, and they forwarded it to Harvard

01:56  20   University for their review of the visa sponsorship.

21           THE COURT:  Sorry.  Forwarded it to Harvard, and

22   Harvard is going to review the visa sponsorship?

23           THE WITNESS:  Yes.

24           THE COURT:  And to your knowledge what actions if any

25   has Harvard taken with respect to that information?

1       THE WITNESS:  I'm not sure.  I tried to determine that

2  this morning.  With the holiday, there are a lot of people who

3  aren't in the office.

4       THE COURT:  Okay.  All right.  Has Immigration and

5  Customs Enforcement been contacted about this case?

6       THE WITNESS:  Yes, sir.  The FBI has two ICE agents

7  that are embedded within our office.  I have been in contact

8  with both of them.  They are aware of the situation but are

9  waiting to determine what will happen here today.

01:57 10       THE COURT:  Regardless of what may happen here, to

11  your knowledge what steps will ICE take if Harvard withdraws

12  their visa sponsorship?

13       THE WITNESS:  It's my understanding that he would be

14  without status within the United States.  Certain things

15  happen.  It would be more of the DOJ legal speaking with

16  Homeland Security legal to determine what to do --

17       THE COURT:  Okay.  So even without ICE action, if

18  Harvard withdraws visa sponsorship for the defendant, he's not

19  legally present?

01:58 20       THE WITNESS:  He's present in the United States

21  without legal status.

22       THE COURT:  Okay.  Any follow-up on my questions?

23       MR. TOLKOFF:  Not from the government.  Thank you,

24  Your Honor.

25       THE COURT:  Okay.

1    CROSS-EXAMINATION BY MR. KELLEY:

2    Q.   In discussion with the ICE agents has there been any

3    discussion about any kind of parole that could be granted to

4    Mr. Zheng to allow him, while this case is pending, to remain

5    in the country?

6    A.   It's my understanding that each case is specific to the

7    individual, and it depends on what happens here today as to

8    what will happen.

9    Q.   Okay.  Was there any discussion with them specifically

01:59 10   about something called a significant public benefit parole that

11   could be allowed to Mr. Zheng?

12   A.   Again, this is something that has to be determined between

13   the attorneys.  I spoke with another investigator like myself,

14   and we know what we would like to happen, but it's beyond our

15   (inaudible) as to what will happen.

16        MR. KELLEY:  Okay.  I don't have any follow-up on

17   that, Judge.

18        THE COURT:  Okay.  Thank you.  Has the substances in

19   the vials been tested, to your knowledge?

02:00 20        THE WITNESS:  No, sir.  It's actually quite a

21   complicated analysis.  We've had this happen previously, and

22   those vials have been under analysis for over a month, up to

23   six weeks.  Our current vials are -- I know they have begun

24   processing, that started before the holidays, but I don't

25   expect analysis or a value determination by Beth Israel to

1    occur in the next few days, if not longer.

2         THE COURT:  Okay.  Thank you.  Do you want to be

3    heard?

4         MR. TOLKOFF:  Just briefly, Your Honor.

5         THE COURT:  Sure.

6         MR. TOLKOFF:  In addition to the matters that have

7    already been presented and argued to the court, I think now we

8    have additional information that cuts in favor of detaining

9    Mr. Zheng.

02:02 10         First, as of today, we now know Mr. Zheng has been

11   terminated.  We all suspected that he would be, but that's no

12   longer a suspicion; it has in fact been confirmed.  So he no

13   longer has a job with Beth Israel.  And a reasonable inference

14   can be made that he will no longer be sponsored by Harvard

15   because of course the purpose of his sponsorship was so that he

16   could conduct research at Beth Israel.

17        And of course we are also now in possession of two

18   pieces of information regarding Mr. Zheng's conduct on the

19   tenth of December.  The first is that all of the bags that

02:02 20   agents found packed in his apartment on December 17 were with

21   Mr. Zheng at the airport on December 10.  When we last appeared

22   before Your Honor, we were not 100 percent sure about where

23   those bags were on December 10 because there was some ambiguity

24   in the evidence.

25        THE COURT:  The suitcases were packed, but there were

still these clear plastic bags back at the apartment.

MR. TOLKOFF:  Yes, Your Honor.  It appears that there were still some remaining effects.  But as testified to by Special Agent Spice, it was a small number of items remaining in the apartment.  It appears that the lion's share of Mr. Zheng's possessions were with him and ready to go.  And very suspiciously, Your Honor, Mr. Li had Mr. Zheng's house key.  I think it's just a matter of common sense that, if you plan on returning to your apartment, one of the things that you would hold on to would be your apartment key.  And in this case Mr. Zheng gave that up to Mr. Li.  That speaks volumes about Mr. Zheng's intent to return to the United States, Your Honor. I think it's clear that he intended to take his electronics and go to China, either never to return or likely not to return any time soon.

As to the presentation of evidence that we've seen this morning regarding photographs of the apartment, it appears all that has really changed on that end is that Mr. Zheng's personal effects have now been unpacked, presumably by his wife, and have now been staged around the apartment.  It looks as if he is living there now.  It looks as if it is more habitable now than it did at the time agents searched the apartment on December 17.  But that doesn't change Mr. Zheng's original intent to leave the United States, not to come back, on December 10.

1        Your Honor, I think that we're talking about someone

2   who has no family, who has -- who has presented the close

3   family friend of his wife's who is affectionally referred to as

4   an uncle but is not in fact a blood uncle, who has no job in

5   the United States, whose only purpose in coming to the United

6   States was to conduct research that he is no longer permitted

7   to conduct and who is on his way out, to return who knows when,

8   if ever.

9        Your Honor, I think this is a clearcut case of a

02:05 10   serious risk of flight, and I think that Mr. Zheng should be

11   detained on that basis.  The information about Mr. Zheng

12   continuing on the lease flies in the face of what was told to

13   the agents when they went and spoke with property management;

14   that there is somebody else coming in to assume that lease.

15   And admittedly, there may be some ambiguity there.  That person

16   has not yet fully executed a new sublease, but that person's

17   information and identification has been provided to the

18   management.

19        THE COURT:  Well, I thought the statement was the

02:06 20   person was going to take over the lease on January 1 of 2020

21   until the lease expires and then would sign another lease.

22   This is Mr. Nixin (phonetic) Wang.

23        MR. TOLKOFF:  That's my understanding as well, Your

24   Honor, which means that that gentleman at a minimum would be

25   living there in addition to Mr. Zheng, if not living there

1  exclusive of Mr. Zheng.  The information as proffered by the

2  defense counsel this morning is Mr. Zheng would simply resume

3  living there, living there alone.  And of course that raises a

4  question of how.  Mr. Zheng is being paid by the Chinese

5  Scholarship Council, and he's being paid, I understand it,

6  $2,000 a month.  The rent on the apartment at 8A, 400 Brookline

7  Ave. is over $2,000 a month.  So where Mr. Zheng is going to

8  come up with the extra money just to cover his cost of living

9  between now and the time of the adjudication of this matter is

02:07 10  very much unclear.

11       Your Honor, on all those bases, I do not believe that

12  we have a viable plan for release.  I believe that we're

13  dealing with an individual who has a very strong incentive to

14  flee and without a doubt has an ability to do so.  And on that

15  basis, I would ask that he be detained.

16       THE COURT:  Mr. Kelley, just refresh my recollection.

17  What's the situation with the uncle?  Is that no longer a

18  possibility?

19       MR. KELLEY:  The situation with the uncle, Judge, is

02:08 20  that I don't believe that the timeframe that we were

21  contemplating is one that is consistent with them being able to

22  have a third bedroom any time soon.  That was sort of the

23  issue.  They are happy to have Mr. Zheng, but they also don't

24  -- they have a two-bedroom apartment, my understanding is,

25  basically, in South Boston, and not enough room.  And so at

1  this point I think it's not anticipated that that would be

2  viable for some time.

3  　　　　　THE COURT:  So where is Mr. Zheng going to live?

4  　　　　　MR. KELLEY:  So, Judge, my proposal is this.  And I

5  provided these to the government this morning, but these are

6  photographs that I received from Mr. Zheng's wife last night of

7  the apartment that I'd ask the court to consider.

8  　　　　　MR. TOLKOFF:  I've seen them and have no objection,

9  Your Honor.

02:09 10  　　　　　THE COURT:  Okay.

11  　　　　　MR. KELLEY:  So at this point, Judge, my understanding

12  of the lease situation, I understand Special Agent Spice's

13  testimony.  I either did not see or did not appreciate the fact

14  that there was this written statement appended to one of the

15  leases that we had for the apartment.  But I spoke with

16  Ms. Bates I believe it was on Thursday that we were notified

17  that Probation had done the home visit and that they had

18  concerns.

19  　　　　　THE COURT:  Okay.  Is this the 26th of December, or

02:09 20  whatever that would be, 18th --

21  　　　　　MR. KELLEY:  I believe it was --

22  　　　　　THE COURT:  -- 17th?

23  　　　　　MR. KELLEY:  I believe it was the 19th when we became

24  aware that there was this issue, and I essentially cold-called

25  the apartment complex and was connected to Ms. Bates.  At that

1   time she was in Florida on vacation.  I believe she said Boca

2   Raton.  She referred me to Mr. Harold, Jack Harold, and gave me

3   a phone number for him, which I tried in the intervening period

4   and finally got a call back this morning from Mr. Harold.  And

5   I was asking him what's the situation with the lease.  He tells

6   me the lease is still valid until August 2020.  So that

7   essentially at this point, legally speaking, Mr. Zheng and

8   Mr. Li are the only ones entitled to be in that apartment.

9   There is no other alternative lease or anything.  I don't know

02:10 10   whether or not the written notification or the written

11   statement there is adequate to disclaim Mr. Zheng's interest in

12   the lease.

13          The way that Mr. Harold expressed it to me was that he

14   recalled Ms. Bates saying that there had been some sort of

15   informal discussion about the lease being transferred.  But

16   when I spoke with Ms. Bates, it was quite clear that anybody to

17   be on the lease needed to be pre-approved, needed to go through

18   the process to get on the lease and that that had not occurred.

19          So I believe where the state -- where everything sits

02:11 20   at this moment is that Mr. Zheng is entitled to be in that

21   apartment as long as he can pay the rent.  I'm told by his wife

22   that through her funds and through her family that they were

23   going to be able to afford that rent so that there is no

24   anticipated roommate coming in and that Mr. Zheng would

25   continue to reside there I would propose on those same

1    conditions that the court had outlined previously.

2           With respect to release here, Judge, I think the

3    statute is quite clear.  The Bail Reform Act says that he shall

4    be released unless there's a serious risk of flight shown by a

5    preponderance of the evidence and no combination on conditions

6    would reasonably assure his appearance.

7           The government is asking the court to find that

8    there's a serious risk of flight established by the inference

9    that Mr. Zheng was going to leave and never come back, Judge.

02:12 10    What they're pointing to is essentially the allegation that

11    there's little to no -- in the home visit conducted on December

12    19 that there was essentially no personal effects.  That's what

13    the Probation report was.  And as is outlined in Special Agent

14    Spice's affidavit, when I spoke with Mr. Li on the 17th, two

15    days before Probation was there, Mr. Li said that he had moved

16    his own belongings into the bedroom that Mr. Zheng had

17    previously occupied and put all of his belongings in the front

18    room where there was a bed on the floor, as you see in the

19    photograph.

02:13 20           So essentially at that point it appears as though

21    Mr. Zheng doesn't have anything in the apartment, that he's

22    just got these two suitcases when Probation goes and visits.

23    But that's not in fact the case.  And we know that from Special

24    Agent Spice and what the FBI found in the search two days

25    previously; that there were other items there and that

```
 1    essentially, you know, I think if there was anything
 2    significant in the luggage beyond clothes, we would have heard
 3    about it.
 4          So essentially what Mr. Zheng had was a ticket going
 5    for I think about 20 days, if memory serves was the itinerary,
 6    and he had two big suitcases.  And he's a student going back to
 7    China.  And his wife is also a student.  And so, Judge, I think
 8    the inference that he was not intending to return is belied by
 9    the fact that there's the return ticket, also belied by the
10    fact --
11          THE COURT:  Is there a return ticket?
12          MR. KELLEY:  There was a return ticket.  That was some
13    of the initial testimony that we heard.  There was an
14    itinerary --
15          THE COURT:  Itinerary.
16          MR. KELLEY:  -- for Mr. Zheng, yes, purchased ticket
17    for him to return on the 29th of December, is my recollection.
18          THE COURT:  Okay.  I don't remember there being a
19    purchased ticket.  But according to the report, there was an
20    itinerary that confirmed a return flight on December 29.
21          MR. KELLEY:  Yes.  And I think that that return
22    flight, Judge, is consistent with the testimony that you heard
23    here about the keys, where the government is trying to assert
24    that this shows -- the fact that apparently Mr. Zheng gave the
25    keys to Mr. Li shows that he was never intending to return
```

back.  But his itinerary, combined with the testimony that
Mr. Liu was in the apartment and going to be vacating the
apartment, I believe with Mr. Zheng was the actual intention,
upon Mr. Zheng's return.  The fact that Mr. Zheng doesn't have
the keys is not inconsistent with him returning at all when
he's got somebody else who is going to need access to the
apartment, is going to stay there for a period until a new
lease starts.  So I think the fact that the keys were given to
Mr. Li is not significant in terms of showing that he was never
going to return.

One other thing, Judge, that I think we haven't heard
that's important --

THE COURT:  But there were two keys.

MR. KELLEY:  There's two keys.  Mr. Li has one.  He's
still living there.

THE COURT:  I thought Li was in China.

MR. KELLEY:  He is currently now.

THE COURT:  But --

MR. KELLEY:  But at the time that --

THE COURT:  Okay.

MR. KELLEY:  -- Mr. Zheng and Mr. Li were at the
airport, Mr. Li had a set of keys because he's still living
there, and Mr. Liu needs a set of keys because he's going to be
living in the apartment while Mr. Zheng is not in the country,
while he's back home visiting his family.

1          THE COURT:  Okay.  And then they're going to vacate

2     the apartment on December 31?

3          MR. KELLEY:  Or thereabouts, yes, my understanding of

4     what the plan had been.

5          THE COURT:  January 1, this Dixin (phonetic) or Nixin

6     (phonetic) Wang is going to move into the apartment with his

7     family?

8          MR. KELLEY:  That was I think the original plan until

9     all of this happened, Judge.  Once this happens, though, then I

10:37  10     think Mr. Liu doesn't want to be involved in the situation,

11     which I think is understandable, and there is no lease.

12     There's nothing signed for the other individual.

13          THE COURT:  So where was -- let's just say all this

14     doesn't happen.  Where is Mr. Zheng going on December 31?

15          MR. KELLEY:  Mr. Zheng?

16          THE COURT:  Yeah.

17          MR. KELLEY:  My understanding is that the lease is

18     valid, Judge, so that he can stay in that apartment.

19          THE COURT:  No.  I'm not arguing about legally he

10:38  20     could take this to court and establish he has superior right to

21     be there.  If the plan was that he's going to abandon the

22     apartment because Li is going to go back to China and Wang is

23     going to come in and take over the lease, where is -- if he's

24     coming back on December 29, where is he going to sleep on

25     December 31 at night to January 1?

1          MR. KELLEY:  You mean when this was all contemplated?

2          THE COURT:  Yeah.

3          MR. KELLEY:  I believe when this was all contemplated,

4    he and Mr. Liu were going to be getting their own apartment

5    together.  The individual that had just arrived from China --

6          THE COURT:  Okay.

7          MR. KELLEY:  -- was getting the keys from Mr. Li.  I

8    believe that's what the plan had been.

9          THE COURT:  I mean, I don't presume to know what may

10:38 10   be available, but isn't that kind of a challenging thing to do?

11         MR. KELLEY:  To?

12         THE COURT:  You get back on the 29th, and you have,

13   you know, 36 hours to get an apartment?

14         MR. KELLEY:  Well, Judge, that's again, you know, in

15   speaking with the apartment complex, everybody needs to be

16   clear.  But, you know, I just know what the plan had been or

17   what I've been told the plan had been, Judge.

18         THE COURT:  In just strikes me as evidence that he

19   wasn't coming back, is what I guess I'm trying to say.

10:39 20   MR. KELLEY:  Well, I think part of the difficulty here

21   -- and this is what I discussed with Ms. Bates -- is the sort

22   of students coming and students going and trying to match

23   people up on leases and everything.

24         THE COURT:  Right.  No.  I appreciate that.  And I can

25   see how you're leaving so a new person comes in and is your

1      roommate.  But that's not the case with Mr. Zheng.  He was

2      leaving the apartment and his work visa or his authorization

3      from Harvard or Beth Israel Deaconess went through April of

4      2020 unless it was extended.

5              MR. KELLEY:  I don't specifically recall the date,

6      Judge.  I believe it was longer than that.

7              THE COURT:  Even --

8              MR. KELLEY:  I believe his wife's might be expiring in

9      April.

10:40 10          THE COURT:  Okay.  I don't understand where he's going

11     to live when he comes back.  And my point is, without that, and

12     having gone through the experience with watching kids trying to

13     get apartments in Boston, it just doesn't strike me to be quite

14     as easy as this.  It's one thing if his roommate was leaving

15     and then somebody else was going to come in and he was going to

16     stay there.  But from what I understand the December 13

17     interview of Ms. Bates established is that they were abandoning

18     the apartment.  "They" being Zheng and Li.  And Wang was taking

19     over the apartment.

10:41 20          MR. KELLEY:  And I think, Judge, I don't specifically

21     know how quickly that can happen in this building.  You know,

22     it is a building that's I think pretty -- an international

23     community.  So I don't know what the circumstances are of how

24     difficult it is in this particular building --

25              THE COURT:  But we do know all of his stuff was packed

1    up.  I mean, there's enough for a medium- to large-size

2    suitcase that's left there, but it's in plastic bins.  I mean,

3    nobody lives like that.  If he was going to stay there, why

4    wouldn't the apartment just look like this?  I mean, what's

5    wrong with the argument that his wife went there and staged

6    this for these photos?  That seems kind of silly.

7         MR. KELLEY:  The only reason I'm submitting those

8    photographs, Judge, is so that Your Honor can see what the

9    apartment was like, what it is now, that there is no other

10:41 10   person that is living there.  And yes, since this time now

11   Mr. Li has left the country.  Mr. Zheng's wife has been to the

12   apartment, cleaning up the apartment yesterday.  She sent me

13   those photographs.  I think it's important for the court to see

14   what the apartment looks like.

15        THE COURT:  I appreciate that.  I guess the reason I'm

16   looking at the evidence that I just mentioned is it looks like

17   Mr. Zheng was leaving the country and not coming back.

18        MR. KELLEY:  Well, I think, Judge, that, again, that

19   goes in the face of the return itinerary, in addition, the fact

10:42 20   that he does have belongings here still, that he has

21   connections, that he's been talking with this other individual

22   about getting another apartment.

23        And I would say even if the court is satisfied that

24   the government shows that he was not intending to come back,

25   that's not the end of the question here in terms of whether or

1    not there is a combination of condition or conditions that can

2    ensure that he will appear in court.

3            THE COURT:  No, it doesn't, but it may reflect his

4    truthfulness when asked, you know, what you're going to do.  I

5    was coming back to the United States.  It just -- again, I

6    don't have hard and fast evidence.  It sounds extremely

7    unrealistic to come back to, of all cities, Boston, on December

8    29 on a flight from China and think that on January 1 you're

9    going to have an apartment.

10:43 10          MR. KELLEY:  Well, I would add this, Judge, that the

11   intention being that he's going to stay with Mr. Li or Mr. Liu

12   is here looking for an apartment.

13          THE COURT:  Li?  Li went back to China.  Wasn't that

14   always what was contemplated?

15          MR. KELLEY:  Mr. Liu.  So the individual who had just

16   arrived.

17          THE COURT:  Mr. Liu is only going to live there,

18   though, until December 31.  It doesn't change what I just --

19   the argument that I'm raising to you; that I can't quite

10:43 20  understand how someone could possibly think they're going to

21   have an apartment in 36 hours.

22          MR. KELLEY:  Because, Judge, it's not just Mr. Zheng

23   getting the apartment.  It's Mr. Liu and Mr. Zheng.  So Mr. Liu

24   is able to find an apartment while he's here.

25          THE COURT:  Okay, I understand.

1          MR. KELLEY:  Okay.  And again, I think going back to

2     the evidence that the court has before it, he returned to the

3     airport the second day.  So he went there on the ninth.  He

4     returns to the airport on the tenth.  At the time that he

5     leaves the airport on the ninth, he's in possession of his

6     passport.  He doesn't need to go back and get his belongings or

7     anything like that.  And yet he goes back to the airport again

8     with his belongings because he's still intending to go to China

9     to visit his family.  And it's not until after that, you know,

10:44  10     that we're here.

11          As I said, he returned to the airport as directed, as

12     told he needed to.  What the court has here that shows against

13     the serious risk of flight is we've got a bond as well with the

14     court as directed to be posted that incentivizes Mr. Zheng to

15     continue to appear.  And also what we discussed at one of our

16     previous hearings, the fact that if Mr. Zheng fled the country,

17     there would be damage to his reputation, his standing in the

18     medical field.  He would be in danger of not being able to go

19     to international conferences and things of that nature as well,

10:45  20     which is important in his field.

21          As I said, Judge, even if the court believes that the

22     government can prove that he was not coming back, there are

23     still these conditions that would ensure his appearance.  What

24     you have before you is a 29-year-old individual who is married.

25     He's a medical doctor.  He's educated.  He has no criminal

history, no substance abuse problems.  He's not on probation or

parole at the time when all this was happening, Judge.  He is,

I believe the evidence is going to be, a respected classmate.

He does have the familial-like tie to the community, his uncle,

Uncle Ziu (phonetic).  He voluntarily sat for an interview with

the FBI as well and spoke to them.

Judge, I think that the conditions that the court had

originally contemplated would be more than adequate to ensure

his continued appearance here.  He does have a place to stay.

He has an address.  As we said in previous hearings, he can

continue to work on his Ph.D. thesis.  He's not going to be

just sitting in an apartment.  But he certainly would be

willing to abide by any condition that the court would set.

THE COURT:  Okay.  Thank you.  Mr. Tolkoff, it's the

government's motion.  I'll give you the last word.

MR. TOLKOFF:  Thank you, Your Honor.

Your Honor, I would note first that this is not simply

the government's take on this situation.  This is also Pretrial

Services' take on this situation.  Pretrial Services initiated

a report that concluded that Mr. Zheng in fact poses a

significant risk of flight.  Pretrial Services had heightened

concerns beyond that after taking a look at that apartment.

And this is not Pretrial Services' first report.  This is

something they do for a living.  This is their wheelhouse so to

speak.  For them to be concerned based on what they were

1    looking at I think is something that we should stop and take

2    note of.

3        There were a handful of things in sort of a Tupperware

4    storage container that belong to Mr. Zheng that remain in that

5    apartment.  There were none of the things you might typically

6    see in an apartment where somebody lives and intends to remain.

7        I think the court's conclusion is exactly right.  That

8    in order for us to find that Mr. Zheng was going to come back

9    and remain living in that apartment, we have to conclude that

10:48 10   Mr. Zheng planned on finding a new place to live between the

11   29th and the 31st of December.  That seems farfetched.  A far

12   more reasonable inference, based on the fact that Mr. Zheng had

13   virtually all -- not all but virtually all of his belongings

14   packed in bags, had surrendered his key to his roommate, was

15   coming back in theory on the 29th but with no place to live on

16   the 31st as of New Year's Day, I think the reasonable inference

17   is he didn't plan on coming back.

18       Your Honor, this is somebody who had every intent of

19   leaving the United States not to return.  His connections to

10:48 20   the district are thin at best.  His basis for remaining here is

21   far slimmer than it was when we first appeared before the court

22   on December 16 because he has now been fired, so he has no

23   legitimate reason to stay in the United States.  We do not know

24   as we sit here exactly what immigration consequences he'll

25   face.  That's a separate department of the executive branch.

They file their separate regulations.  But it is a virtual

guarantee that he will face some form of immigration

consequences.  Because the only basis for him being here is his

research, which of course he can't do anymore.

Your Honor, for all of those reasons, for everything

I've previously submitted to the court, I would ask that he be

detained.

THE COURT:  I'm going to grant the government's motion

to detain the defendant.  This is what the law is.  "To detain

someone under the Bail Reform Act, the judicial officer must

find by a preponderance of the evidence that the defendant

poses a risk of flight."  I find that he does.  But, "The

judicial officer may then detain a person pending trial only if

the judicial officer determines that no condition or

combination of conditions will reasonably assure the appearance

of the person as required."

In making that determination, I'm required to consider

the factors in 3142(g).  Almost every one of them supports

release of this defendant, almost every one.  The nature and

circumstances of the offense charged, what the defendant is

charged with, making false statements to a law enforcement

officer under 1001.  The offense does not involve violence, a

minor victim, controlled substance, firearms, explosive or

destructive devices or the other things identified in the

statute.

1        The weight against the evidence is the next factor I'm

2   required to consider.  The weight of the evidence is strong.

3   The defendant denied that he had possession of and was taking

4   from the United States biomedical materials when he clearly

5   was, and the defendant later admitted that.  I suppose at a

6   trial there may be some wiggle room because this was done

7   through a Mandarin interpreter; and a good attorney, and this

8   defendant has one, could exploit that.

9        But I think the evidence is strong.  The history and

10:59 10   characteristics of the person.  The defendant is well-educated.

11   I think he's a medical doctor.  In any case he has an

12   undergraduate degree in clinical medicine and a master's degree

13   in surgery, specializing in urology, that he received in 2017.

14   He began his Ph.D. studies at Sun Yat-sen University in 2017.

15        He has no criminal history.  He has no history of drug

16   or alcohol abuse or failure to appear at a prior court

17   proceeding.  He was not on supervision of any kind at the time

18   of the offense.  And the nature and seriousness of the danger

19   to a person or community that would be posed by the person's

11:00 20   release, there just is no evidence that he would pose such a

21   danger.

22        We don't know what the biomedical material is that's

23   in those vials and what it relates to.  It may be perfectly

24   innocent research material.  In fact, it may be materials that

25   will help to save lives; we just don't know.  But because

there's no proof, I don't find that.

So having made that assessment, why hold the defendant?  And that is because the defendant basically has no ties to the United States.  He has lost his job.  He admitted to stealing.  He's not going to get another job in the United States.  Harvard University in all likelihood is going to withdraw their sponsorship, and the defendant is going to be here illegally.

The defendant's conduct reflects a serious breach of a good faith commitment to Harvard, to Beth Israel Deaconess Medical Center.  It reflects a willingness, assuming he's working alone -- and I'll come back to that in a second -- a willingness to put himself above what appears to be a very worthwhile program, above the reputation of Harvard University, above the reputation of Beth Israel Deaconess Medical Center by engaging in this conduct.  It is a disgrace on them, and this defendant caused it.  And that factors heavily in the court's assessment.

There is also a very significant link between this defendant and the Chinese government with whom the United States does not have an extradition treaty.  The defendant is sponsored by the Chinese government.  As I understand it, the $2,000 per month stipend that he receives is through the China scholarship program.  And according to the affidavit of Special Agent Kara Spice, based on her 15 years of experience as an

agent, the Chinese government -- and I'm quoting from her affidavit at paragraph 6 -- "uses post-graduate students and post-doctorate researchers and professors in the field of science, technology, engineering and mathematics, STEM, to obtain and often steal intellectual property from the United States to benefit Chinese academic institutions and businesses."

There is some evidence that that was what was going on here.  We now have evidence that the defendant was not the only person who was smuggling biological specimens out of the United States but that another person who worked in the same lab did the same thing and successfully smuggled those biological specimens to China.  Of course the defendant himself was bringing his specimens to China either for the benefit of the government or for himself so he could do this work, get credit for it, pound his chest and say, "Everybody look at me."

I'm not going to resolve whether or not the defendant was coming back to the United States.  I agree with Mr. Kelley that there's a logical reason for the keys to be given to Mr. Li.  I'm not entirely convinced, and I don't equate a confirmed flight itinerary with having a ticket.  But even if it -- even if there was, the court's concern is whether or not the defendant was being truthful when he said that he intended to return to the United States on December 29.  It is entirely possible that Mr. Liu was going to look for and find an

1    apartment in the two and a half weeks that he had while he was

2    living at 400 Brookline Avenue in Unit 8A, but as a practical

3    matter, I'm not persuaded by that.

4         And certainly the idea that the defendant would come

5    home on December 29 and within 48 hours find an apartment

6    unfortunately borders on ludicrous.  It doesn't happen in

7    Boston, unless you're paying top dollar.  And on $2,000 a

8    month, that's not considered top dollar.

9         I'm aware of the fact that, if the defendant is

11:06 10   convicted, he may get a non-jail sentence or very little jail

11   time, at least on the charge as it stands.  And that weighs

12   heavily into the calculus, and it has to because that is one of

13   the factors that bears on risk of flight, the jail sentence

14   that someone is facing.  But in these particular circumstances

15   where there is a link, a corroborated link between the

16   defendant and the Chinese government, I'm not convinced that

17   with their assistance the defendant could not very easily get

18   out of the country.

19        The standard is a preponderance of the evidence.  I

11:07 20   find -- it's an extremely close call, but I find that the

21   government has inched the evidence to precisely that standard

22   that no condition or combination of conditions will reasonably

23   assure Mr. Zheng's appearance, so I'm going to order the

24   defendant detained.

25        Mr. Zheng, would you stand, please.

1          You have a right to appeal my determination.  It's a

2    very close call.  Another judge could easily look at these

3    facts and come to a different conclusion, and you're hereby

4    notified of that right.

5          Mr. Tolkoff, anything else?

6          MR. TOLKOFF:  No, Your Honor, but I think we should

7    set a date for a status conference before Your Honor.

8          THE COURT:  For what?  What would the agenda be?

9          MR. TOLKOFF:  Well, Your Honor, the government's next

11:08 10   step will be to seek indictment.

11         THE COURT:  When that happens it will go to whomever

12   for the initial.  I appreciate that.  I don't think it's quite

13   necessary.  Mr. Kelley, anything else?

14         MR. KELLEY:  I don't believe so, Your Honor.

15         THE COURT:  Okay.  We're in recess.  Thank you.

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3           I, Kelly Mortellite, Registered Merit Reporter

4   and Certified Realtime Reporter, in and for the United States

5   District Court for the District of Massachusetts, do hereby

6   certify that the foregoing transcript is a true and correct

7   transcript of the stenographically reported proceedings held in

8   the above-entitled matter to the best of my skill and ability.

9                    Dated this 7th day of January, 2020.

10

11                   /s/ Kelly Mortellite

12                   _____

13                   Kelly Mortellite, RMR, CRR

14                   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25