**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
UNITED STATES OF AMERICA, ) CRIMINAL NO. 1:19-mj-04532-DHH-1
     Plaintiff,           )
                          )
                          ) BOSTON, MASSACHUSETTS
          v.              ) DECEMBER 16, 2019
                          )
ZAOSONG ZHENG,            )
     Defendant.           )
                          )
```

TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING
BEFORE THE HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:   UNITED STATES ATTORNEY'S OFFICE
                      BY: Benjamin Tolkoff, AUSA
                      One Courthouse Way, Suite 9200
                      Boston, MA 02210
                      617-748-3183
                      benjamin.tolkoff@usdoj.gov

For the Defendant:    Brendan O. Kelley, Esq.
                      Federal Defenders Office
                      51 Sleeper Street, 5th Flr.
                      Boston, MA 02210
                      617-223-8061
                      brendan_kelley@fd.org

Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

1                        **I N D E X**

2 **WITNESSES**              **DIRECT**   **CROSS**      **REDIRECT**    **RECROSS**

3 **Government's:**

4 SA KARA D. SPICE        7        20

5 **EXHIBITS  DESCRIPTION**                          **MARKED**  **IN EVIDENCE**

6 **Government's:**

7 1      Affidavit For Defendant's Arrest           10           10

8 2-5   Photographs                                 29           29

9

10 **ARGUMENT**                                                    31

11 **RESPONSE**                                                    36

12 **ARGUMENT**                                                    41

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  COURT CALLED INTO SESSION

2  (11:29:19 A.M.)

3           THE CLERK:  ... for the District of Massachusetts

4  is now in session, the Honorable David Hennessy presiding.

5  You may be seated.

6           Today is December 16, 2009 [*sic*].  We are on the

7  record in the matter of the United States vs. Zaosong Zheng.

8  It is Docket 19-mj-4532.

9           Will counsel please identify themselves for the

10 record?

11          MR. TOLKOFF:  Your Honor, good morning.  Ben

12 Tolkoff for the United States.

13          THE COURT:  Good morning.

14          MR. KELLEY:  Good morning, Your Honor.  Brendan

15 Kelley for Mr. Zheng.

16          THE COURT:  Good morning.

17          THE CLERK:  I'll swear in the interpreter.

18          Will you please raise your right hand?

19    GOVERNMENT INTERPRETER SWORN

20          THE CLERK:  And please state and spell your name

21 for the record.

22          THE INTERPRETER:  Yes.  My name is Yingjie Abel,

23 Mandarin interpreter.  Y-I-N-G-J-I-E, space, A-B-E-L.

24          THE COURT:  Good morning.

25          THE INTERPRETER:  Good morning, Your Honor.

4

1          THE COURT:  Okay.  This is on for a detention

2 hearing in this matter.  The Government moved for detention

3 on the grounds of risk of flight.

4          I have received and read the Pretrial Services

5 report.

6          Just before we get started, Mr. Tolkoff, as a

7 result of any of this, is there a change in the defendant's

8 immigration status?

9          MR. TOLKOFF:  Your Honor, I do not believe that

10 there has been a change between the last time we appeared

11 before Your Honor and today.  Mr. Zheng's status in the

12 United States, as I understand it, is contingent upon his

13 continued work at Beth Israel under the J-1 Visa program.

14 Because it was Beth Israel from whom Mr. Zheng stole

15 samples, the Government suspects quite strongly that his

16 immigration status will change, but it has not yet, Your

17 Honor.

18          THE COURT:  Okay.  All right.

19          Mr. Kelley, how are we proceeding?

20          MR. KELLEY:  Well, Judge, I think we're here for a

21 probable cause hearing.

22          THE COURT:  Oh, I apologize.  Is it probable

23 cause, as well?

24          MR. KELLEY:  It is, Judge.

25          THE COURT:  Okay.

1          MR. KELLEY:  We did sit down with Pretrial

2  Services with an interview, Judge, and we're essentially

3  proposing that Mr. Zheng be allowed to return back to his

4  apartment under a electronic monitoring.

5          THE COURT:  Mr. Tolkoff, just on that issue,

6  what's the Government's position?

7          MR. TOLKOFF:  Your Honor, the Government's

8  understanding is that Mr. Zheng is renting an apartment at

9  400 Brookline Avenue.  The rent, as the Government

10  understands it, is about a thousand dollars a month.

11          THE COURT:  Or his portion of it is.

12          MR. TOLKOFF:  Yes.

13          THE COURT:  Right.

14          MR. TOLKOFF:  The funding for Mr. Zheng's J-1 Visa

15  program comes from the Scholarship Council of China and is,

16  as I understand it, approximately 2,000 a month.  As soon as

17  Mr. Zheng's status as a J-1 Visa holder ends, and I think it

18  is a virtual certainty that that will happen, when Beth

19  Israel becomes more aware.  They are aware in certain

20  particulars, but they are not fully aware, because this

21  matter is, first, very new.  It really only became known to

22  the Government as of December 9.  And Beth Israel has not

23  entirely read into the specifics of what has happened.  And

24  the Government is, of course, still investigating, but, in

25  effect, Mr. Zheng stole from his employer.  The Government

6

1 is not aware of any job that you can keep when you get

2 caught stealing from your employer.

3          And so I think it is a fair conclusion that he

4 will certainly lose his position with Beth Israel, at which

5 point he will have no means of income to pay the rent at

6 that apartment.  He will also be somebody without status in

7 the United States, and so it will be unlawful for him to

8 work in any other capacity.  So I do not see how that is a

9 viable plan for the pendency of the adjudication of this

10 case, Your Honor.

11          THE COURT:  All right.  We can proceed then with

12 the hearing.  Before we do, Mr. Kelley, I had asked the

13 defendant to prepare a more detailed financial affidavit.

14 What's the status of that?

15          MR. KELLEY:  Judge, I have not had an opportunity

16 to sit down with him.  I know that there's documentation

17 that needs to be gathered for that.  I had intended to come

18 here and ask the Court for some additional time.  I know

19 Your Honor had approved us providing the affidavit to

20 private counsel that his wife was present here in the

21 courtroom was consulting with.  They have not been retained

22 at this point.

23          THE COURT:  Okay.

24          MR. KELLEY:  But because there's significant

25 financial material that we need to gather for that, I'm

7

1 going to ask for a little bit more time.

2          THE COURT:  Okay.  I'm going to grant that motion.

3 The provisional appointment of the federal public defender

4 will continue.  I will set next Monday as a date.  If you

5 get close to that date and you need a little bit more time,

6 let me know, but let's set that so we have it at least as a

7 date to work from.

8          MR. KELLEY:  Yes, Judge.

9          THE COURT:  All right.  So let's proceed then both

10 on probable cause and detention.

11          Mr. Tolkoff, go ahead.

12          MR. TOLKOFF:  Your Honor, thank you.  The

13 Government calls Federal Bureau of Investigations Special

14 Agent Kara D. Spice.

15          THE CLERK:  Raise your right hand.

16      Government Witness SA KARA D. SPICE SWORN

17          THE CLERK:  Please state and spell your name for

18 the record.

19          THE WITNESS:  Kara, K-A-R-A, middle initial D,

20 SPICE, S-P-I-C-E.

21          THE COURT:  Thank you.  You can be seated.

22                     SA KARA D. SPICE

23                     DIRECT EXAMINATION

24 BY MR. TOLKOFF:

25 Q.   Good morning, Special Agent Spice.

8

```
 1  A.    Good morning.

 2  Q.    And you're a special agent for the Federal Bureau of

 3  Investigations; is that correct?

 4  A.    That's correct.

 5  Q.    And you work here in the Boston field office; is that

 6  right?

 7  A.    That's correct.

 8  Q.    How long have you been an FBI agent?

 9  A.    15 years.

10  Q.    And what have been some of your responsibilities as an

11  FBI agent?

12  A.    I'm member of the forensic hazard evidence response

13  team as well as conducting different investigations for

14  national security, as well as healthcare fraud and some

15  other.

16  Q.    Thank you.  And did you participate in the

17  investigation of Zaosong Zheng?

18  A.    Yes.

19  Q.    And do you see him here today?

20  A.    I do.

21  Q.    Would you identify an article of clothing that he's

22  wearing, please?

23  A.    He is wearing a olive-tan jumpsuit.

24          MR. TOLKOFF:  And Your Honor, I would ask that the

25  record reflect that the witness has identified the
```

9

1  defendant.

2           THE COURT:  Yes.

3           MR. TOLKOFF:  And, Your Honor, if I may approach?

4           THE COURT:  Yes.

5           MR. TOLKOFF:  For the record, I'm passing the

6  witness what has been marked as Government 1.

7  BY MR. TOLKOFF:

8  Q.   Special Agent Spice, do you recognize that?

9  A.   I do.

10 Q.   What is it?

11 A.   It is the affidavit for the arrest of Mr. Zheng.

12 Q.   And on what basis was his -- what charge was the arrest

13 --

14 A.   The charge was false statements, 1001, 18, code.

15 Q.   Who drafted that affidavit?

16 A.   Myself and you.

17 Q.   Okay.

18          MR. TOLKOFF:  Your Honor, at this point I would

19 move Government's 1 into evidence.

20          THE COURT:  Any objection?

21          MR. KELLEY:  Judge, just to the extent that some

22 of it contains hearsay from CBP officers, I would object on

23 that basis.

24          THE COURT:  Okay.  It's overruled.  It's admitted.

25          MR. TOLKOFF:  Thank you, Your Honor.

1        GOVERNMENT EXHIBIT NO. 1, MARKED & ADMITTED

2   BY MR. TOLKOFF:

3   Q.    Special Agent Spice, were you working on December 9th

4   and December 10th of 2019?

5   A.    Yes, I was.

6   Q.    And are you familiar with the facts that led to Mr.

7   Zheng's arrest?

8   A.    Yes, I am.

9   Q.    How did Mr. Zheng first come to the attention of

10  federal law enforcement?

11  A.    We were notified from Customs & Border Patrol officers

12  that there was an incident at the airport involving unknown

13  biological samples within a passenger's luggage.

14  Q.    And when you say at the airport, is that Logan Airport

15  here in Boston, --

16  A.    Sorry.  Boston local airport --

17  Q.    -- and that's in the District of Massachusetts?

18  A.    Boston local -- Logan Airport.

19  Q.    Great.  Thank you.  But I apologize.  I cut you off.

20       So there were unknown samples, as you said, found in a

21  passenger's luggage.

22  A.    Correct.

23  Q.    All right.  And did you have an opportunity to learn

24  more about what was, in fact, found in that passenger's

25  luggage?

1 A.   Yes, I was.  I received a report from Customs & Border

2 Patrol as well as I also read -- the responding agents

3 described what they had found, and I received photographs of

4 the materials.

5 Q.   And who was the passenger?

6 A.   Mr. Zheng.

7         MR. TOLKOFF:  And, Your Honor, if I may approach?

8         THE COURT:  Yes.

9         MR. TOLKOFF:  For the record, I'm passing the

10 witness what has previously been marked as Government's 2,

11 3, 4, 5.

12 BY MR. TOLKOFF:

13 Q.   Special Agent Spice, can you please take a look at

14 those exhibits and let me know if you recognize them?

15 A.   I recognize them.

16 Q.   What are they?

17 A.   It is a document that I use to -- a 302 to document the

18 receipt of the photographs from Customs & Border Patrol.

19 Q.   And what do the photographs depict?

20 A.   The photographs depict the state of the biological

21 materials as found in Mr. Zheng's suitcase.

22 Q.   And Special Agent Spice, are you familiar with a

23 regulation, 49 CFR, Code Of Federal Regulation, 173.4b?

24     Does that regulation ring a bell?

25 A.   I believe it's 143 -- or sorry.  Yes.  I'm sorry.  I

12

1 apologize.  173.4b, 49 CFR

2          MR. TOLKOFF:  And, Your Honor, if I may I

3 approach?

4          THE COURT:  Yes.

5          MR. TOLKOFF:  And for the record, I'm passing the

6 witness a copy of the regulation as it is printed.

7 BY MR. TOLKOFF:

8 Q.   Special Agent Spice, would you mind taking a look at

9 that, please?  What are some of the requirements for the air

10 travel transportation of biological samples?

11 A.   It is my understanding --

12          MR. KELLEY:  Judge, I'd object on the basis for

13 her -- if it's --

14          The regulation's the regulation.  I don't know

15 that there's a foundation that she's familiar with

16 specifically what it requires.

17          THE COURT:  Okay.

18          MR. KELLEY:  If we're talking about just having

19 her read the regulation.

20          THE COURT:  Okay.  If you want to just have her

21 read the regulation or a portion of it in, that's fine.

22          MR. TOLKOFF:  Sure, Your Honor.  The Government

23 would actually move just that the Court take judicial notice

24 of the federal regulation.

25          THE COURT:  Okay.  Would you read the relevant

1 portion you've identified with respect it the air travel

2 transportation of biological material?

3          THE WITNESS:  Yes.  Non-infectious specimens such

4 as specimens of mammals, birds, amphibians, reptiles, fish,

5 insects and other invertebrates containing small quantities

6 of ethanol, formaldehyde solution, flammables, alcohols, and

7 isopropenyl are not subject to the requirements of the sub

8 chapter provided the following packaging, marking and

9 documentation provisions are applicable as met:

10          The specimens are wrapped in a paper towel or

11 cheese cloth moistened with alcohol or alcohol solution and

12 placed in a plastic bag that is heat sealed;

13          Any free liquid in the bag must not exceed 30

14 milliliters, So the samples must be placed in vials or other

15 rigid containers with no more than 30 milliliters of alcohol

16 or alcohol solution;

17          The containers are placed in a plastic bag that is

18 heat sealed;

19          The bag specimens are placed in another plastic

20 bag with sufficient absorbent material to absorb the entire

21 liquid contents inside the primary receptacle;

22          The outer bag, plastic bag, is then heat sealed;

23          The completed bag is placed in a strong outer

24 packaging with sufficient cushioning material that conforms

25 with subpart B of this part 173;

1          The aggregate net quantity of flammable liquid in

2  one outer packaging may not exceed 1 liter;

3          And the other package must be legibly marked

4  "Scientific Research Specimens, 49 CFR 173.4b applies."

5  BY MR. TOLKOFF:

6  Q.    Thank you.  And Special Agent Spice, how were the

7  specimens that -- or the items, I should say, that are

8  depicted in the photographs in Government's 3, 4 and 5

9  packaged?

10  A.    It is my understanding --

11        Well, from the photograph the vials were wrapped in

12  what appears to be plastic wrap like cling wrap, and then

13  those vials were hidden within a sock within Mr. Zheng's

14  suitcase.

15  Q.    And does there appear to be any labeling marking them

16  as scientific specimens?

17  A.    No, there was not.

18  Q.    Now, when these items were found --

19        First, I'm sorry, where were they found?

20  A.    Within a sock.

21  Q.    I'm sorry.  But the sock was where?

22  A.    Within the passenger's suitcase.

23  Q.    So when they were found in the luggage, what action to

24  your knowledge did CBP agents take?

25  A.    They removed the items from the suitcase, and this was

1 notified -- they found --

2      They were doing their inspection of suitcase upon their

3 authorities at the airport.  When they found these samples,

4 they then went to look for the passenger at the gate.  They

5 met Mr. Zheng at the gate where they asked him about the

6 samples.  They asked if -- they did not disclose that they

7 had already found the samples, but they asked if he had any

8 biological material within his suitcases, and he denied it.

9 Upon --

10 Q.   What, to your knowledge, did he say?

11 A.   He said he did not have any research samples.

12 Q.   And then what action, if any, did the CBP officers take

13 to your knowledge?

14 A.   They had him go to the secondary inspection area of

15 Terminal E where they asked him further information.

16      They then showed him the samples.  He stated that they

17 weren't of any importance.

18      Upon that, they then had him -- they further

19 interviewed him -- they further interviewed him where he

20 then disclosed that he had actually stolen the research

21 materials from Beth Israel Hospital.

22 Q.   And was there any other material found in Mr. Zheng's

23 -- or any other items, I should say, found in Mr. Zheng's

24 either his luggage or his carry-on?

25 A.   He was also in possession of a laptop that he said

16

1 belonged to another individual, as well as I believe he has

2 a laptop and a cell phone.

3 Q.   Did CBP take those items, or did they return them to

4 Mr. Zheng?

5 A.   His -- the laptops as well as the biological material

6 was seized.  Well, the biological material was seized, and

7 the laptops are held within their possession.

8 Q.   And at the time Mr. Zheng was initially identified

9 Customs & Border Patrol --

10     Now, you said that he was about to board a flight.

11     Do you know what country he was headed to?

12 A.   It was a Hainan Airlines flight to China.

13 Q.   Now, Mr. Zheng at that point was permitted to leave.

14 This was on December 9; is that correct?

15 A.   Correct.

16 Q.   And he was --

17     What was the request made of him when he left the

18 airport?

19 A.   CBP requested that they needed additional time to

20 review the materials, the digital materials; and therefore,

21 he was allowed to leave the airport and return on the 10th

22 at noon.

23 Q.   An to your knowledge, did Mr. Zheng return the

24 following day?

25 A.   He did.

1  Q.   And at that point Customs & Border Patrol was not the

2  only investigative agency investigating Mr. Zheng; is that

3  correct?

4  A.   Correct.

5  Q.   Was FBI at this point involved?

6  A.   Yes.

7  Q.   And who was at the airport then when Mr. Zheng returned

8  to get his computers?

9  A.   Different investigators that I work with as well as an

10 interpreter from the FBI.

11 Q.   And after Mr. Zheng returned, was he subsequently

12 interviewed?

13 A.   He was.

14 Q.   And was he advised of his Miranda rights --

15 A.   Yes.

16 Q.   -- before he was interviewed?

17 A.   Yes.  Sorry.

18 Q.   And to your knowledge, did he waive those rights?

19 A.   To my knowledge, he did.

20 Q.   And did he provide a statement?

21 A.   Yes, he did.

22 Q.   Now, in sum and substance, to your knowledge what was

23 Mr. Zheng's explanation of the items?  Start first with the

24 items in the vials found in his luggage.

25 A.   I'm not privy to the resulting interview report.  From

1 my understanding he did claim that the items that were in

2 his suitcase was research that he had taken from Beth Israel

3 Hospital.  Two vials were antibodies that another individual

4 in China asked him to bring home from -- and then there were

5 eight vials that were research that he had taken as well as

6 eleven vials of research that he replicated.  I may have

7 that reversed, but.

8 Q.   And during the course of the past few days

9 investigating Mr. Zheng, have you learned which lab or which

10 part of Beth Israel he was doing research in?

11 A.   I've learned that it's a research lab under a Dr. Way

12 (phonetic), and it is a research lab that conducts research

13 regarding oncology.  Cancer.

14 Q.   And have you learned what Mr. Zheng's status in the

15 United States -- his immigration status is in the United

16 States?

17 A.   Yes.  Mr. Zheng is here as a J-1 research scholar,

18 meaning that he is here to do research where you have to be

19 sponsored by an academic institution.  In this case it is

20 Harvard, as well as where research is conducted, where Beth

21 Israel is a researcher location for Harvard University, his

22 sponsorship.

23      Usually when a J-1 Visa comes in, one of the questions

24 the State Department asks is how will you fund yourself

25 while you're in the United States.  The funding is usually

19

1  the person's personal funds, or it's who their actual

2  employer is.  In this case it was the China Scholarship

3  Council, so --

4  Q.   So -- I'm sorry.  If I can cut you off.

5       So Mr. Zheng is currently being paid by the China

6  Scholarship Council?

7  A.   Correct.  They're funding his stay in the United

8  States.

9  Q.   And Harvard was the sponsor for the J-1 Visa.

10 A.   At Beth Israel Hospital, correct.

11 Q.   But for the purposes of conducting research at Beth

12 Israel; is that right?

13 A.   Correct.

14 Q.   Thank you.

15      And were you able to learn during the course of the

16 past few days of investigating Mr. Zheng where he lives?

17 A.   It is my understanding he lives at 400 Brookline Avenue

18 in Boston.

19 Q.   And do you know how he makes rent on that apartment, if

20 he pays rent?

21 A.   It's my understanding that he and another individual

22 live within the residence, and the rent split is a thousand

23 dollars each.

24 Q.   To your knowledge, does Mr. Zheng have any status in

25 the United States outside of the J-1 Visa?

20

1  A.   I believe the J-1 Visa is his only status.

2          MR. TOLKOFF:  Your Honor, I have no further

3  questions of the witness.

4          THE COURT:  Okay.  Mr. Kelley?

5                      CROSS-EXAMINATION

6  BY MR. KELLEY:

7  Q.   Special Agent Spice, I just have a few questions for

8  you.

9       You were present in Court when Mr. Zheng was first

10 brought before Judge Hennessy; is that right?

11 A.   Correct.

12 Q.   Okay.  And you were present when an affidavit was

13 filled out.

14 A.   Correct.

15 Q.   Do you recall that being discussed?

16      You were present when there was --

17      Well, maybe you didn't hear.

18      There was an affidavit that was filed; right?

19 A.   Correct.

20 Q.   Are you familiar with the contents and whether or not

21 that includes additional income that he and his wife have

22 access to that can be used to support him?

23      I guess let me ask, because you didn't review the

24 affidavit yourself; right?

25 A.   I was the -- for the complaint?

1  Q.    The affidavit.  Financial affidavit.

2  A.    No, I've not reviewed that.

3  Q.    All right.  Now, in the course of the last few days

4  have you had occasion to -- you've had occasion to

5  investigate Mr. Zheng and his activities in the United

6  States you mentioned; right?

7  A.    Minimally, yes.

8  Q.    Minimally to try and see whether this is just some

9  individual going back to China or whether this is something

10 much, much bigger; correct?

11 A.    Correct.

12 Q.    Okay.  And in the course of that investigation have you

13 become aware that he's married to Wen Jee Ju (phonetic)?

14 A.    Yes.

15 Q.    And that she is also a medical doctor.

16 A.    I don't know what her pedigree is, but I'm aware that

17 she's also here in the United States conducting research.

18 Q.    Studying.

19 A.    Studying.

20 Q.    Correct?

21       Doing the same sort of thing that Mr. Zheng is doing,

22 working in a lab; is that right?

23 A.    I did not research what exactly she's doing.

24 Q.    Okay.

25 A.    I only know his statements.

Judy Bond, CERT
Certified Federal Court Transcriber
judy@bondcourtreporting.com

22

1   Q.   All right.   You know from your investigation that Mr.

2   Zheng has been in the country for about 16 months; is that

3   right?

4   A.   I believe so.

5   Q.   Give or take.   And let me ask you this.   You were

6   notified on the 9th -- or this all happened on the 9th that

7   he got stopped at the airport.

8        When did you personally get notification?   On the 9th

9   or the 10th?

10  A.   The 9th.

11  Q.   The 9th.

12       And at that point was Mr. Zheng still in custody, or

13  had he been allowed to leave Logan Airport?

14  A.   He was allowed to leave Logan airport.

15  Q.   Now, in terms of his interaction with the Customs &

16  Border Patrol agents, are you aware of there was a video

17  that?

18       Have you personally reviewed anything with respect to

19  that?

20  A.   I do not believe there's a video.

21  Q.   Okay.   So the only thing that informs your

22  understanding of what that conversation was is what you were

23  told by CBP agents; is that right?

24  A.   They actually provided a report.

25  Q.   Okay.   Provided a report, but not an audio recording or

23

1 some other independent means of verifying what exactly was

2 said; right?

3 A.   No other means.

4 Q.   Okay.  Are you aware of whether or not the CBP agents

5 had any kind of interpreter with them when they spoke to Mr.

6 Zheng at the airport?

7 A.   I haven't verified this, but it's my understanding that

8 one of the agents actually spoke Mandarin that interviewed

9 him.

10 Q.   Okay.  And your understanding is that an agent may have

11 spoke Mandarin.  You don't know to what degree they're

12 proficient; is that right?

13 A.   I do not know.

14 Q.   Okay.  Would you agree from your training and

15 experience Mandarin can be a complicated language?

16 A.   Yes.

17 Q.   And so it's key to know exactly what's said and what

18 meant -- what meaning is being conveyed by what's said;

19 right?

20 A.   I would assume so, yes.

21 Q.   All right.  You didn't personally see these materials

22 in the suitcase itself; right?

23 A.   No.

24 Q.   Have you since seen them?

25 A.   In person?

1  Q.   In person.

2  A.   No, only photographs.

3  Q.   Only photographs, okay.

4       You're not aware of exactly how much material, whatever

5  this is, is in these vials; is that right?

6  A.   No.  There's certainly assumptions I can make from my

7  background that each of these vials contain .5 milliliters

8  to 5 milliliters of fluid.

9  Q.   Okay.  Now, with respect to -- with respect to this

10 material, you don't believe that it was flammable or

11 anything like that; right?

12 A.   I don't know what his scientific research is or what

13 the material would be that the biological samples contained

14 within.

15 Q.   Okay.  You are aware -- you mentioned on direct

16 examination that Mr. Zheng is studying in a lab studying

17 oncology; is that right?

18 A.   Yes.

19 Q.   Cancer research.

20 A.   Correct.

21 Q.   Correct?

22      In the course of your discussion or other agents'

23 discussion with Mr. Zheng, did you become aware of whether

24 or not Mr. Zheng's father had deceased from cancer?

25 A.   I am not aware of that.

25

1   Q.   Did that come up at all?

2   A.   No.

3   Q.   No.  Okay.

4        In any event, Mr. Zheng told you that he was in a lab,

5   that cancer was what was being studied in the lab; is that

6   right?

7   A.   He did not state it to me.  I didn't interview him.

8   Q.   Okay.  To --

9   A.   Interviewing agents, yes.

10  Q.   -- interviewing agents.

11       Was that interview recorded?

12  A.   No.

13  Q.   And you mentioned that there was a FBI interpreter that

14  was present; is that right?

15  A.   Correct.

16  Q.   Is that interpreter certified in the same manner that a

17  court interpreter would be certified?

18  A.   I'm not aware of the standards for interpreters.

19  Q.   Okay.  So it could be someone who has to do some study

20  and pass a test or could be someone who's just familiar with

21  Mandarin.

22  A.   My knowledge of this particular interpreter is she's a

23  native speaker.

24  Q.   Okay.

25  A.   Can I clarify one thing?  The interview was attempted

26

1  to be recorded, but the recording device malfunctioned, and

2  no recording was made.

3  Q.   Okay.  There was an attempt to record it by audio

4  means.

5  A.   Yes.

6  Q.   Or by visual, as well?

7  A.   Audio.

8  Q.   Audio.  Okay.

9        THE COURT:  And I'm sorry.  What interview are we

10 talking about?

11        THE WITNESS:  The interview by the FBI --

12        THE COURT:  The FBI?

13        THE WITNESS:  FBI.  On December 10.

14        THE COURT:  Okay.

15 BY MR. KELLEY:

16 Q.   In the course of speaking with Mr. Zheng by FBI agents,

17 you said that he told agents that the samples were

18 antibodies or something that he was bringing home to an

19 individual in China; is that right?

20 A.   I know that two of the samples of the 21 were

21 antibodies.

22 Q.   Okay.

23 A.   I don't know the other 19.

24 Q.   In the course of that discussion was there any mention

25 by Mr. Zheng of the fact that his lab in China was

27

1 interested in what his research had been here in the United

2 States?

3 A.   I'm not aware of those statements.  He may have made

4 them; but again, I'm not privy to that interview report yet.

5 Q.   Okay.

6 A.   It's still drafted.

7 Q.   It's still being drafted.

8      Was there any mention that it was sort of a collegial

9 thing, that colleagues in a scientific community are talking

10 about what research activities are going on --

11 A.   Again, I'm not privy to that information.

12 Q.   Right.  You said that Mr. Zheng to your understanding

13 is here on a J-1 Visa; is that right?

14 A.   Correct.

15 Q.   The visa was sponsored by Harvard; correct?

16 A.   Correct.

17 Q.   For him to work at Beth Israel --

18 A.   Correct.

19 Q.   -- Hospital; is that right?

20      Okay.  You're not aware at this moment whether or not

21 Harvard is going to rescind their sponsorship of Mr. Zheng.

22 A.   I'm not aware.

23 Q.   Okay.  And to your knowledge, no discussions have been

24 had with Harvard about that being the case; right?

25 A.   My understanding is the complaint is under seal;

28

1  therefore, we wouldn't be able to disclose that information

2  to them.

3  Q.   Okay.  Have you been contacted by anyone from Harvard

4  or Beth Israel about what his current situation is?

5  A.   I personally have not.  I'm not aware if --

6       I'm not sure what the answer would be for the other

7  investigative agents.

8  Q.   Okay.  In the course of speaking with agents, did Mr.

9  Zheng tell them what his educational experience was; where

10 he had studied in China, where he was studying here?

11 A.   Those are logical interview questions, but I have not

12 been privy to the report, so I don't know what those answers

13 are.

14 Q.   Okay.  All right.  Thank you.

15      To be clear, Mr. Zheng was stopped by Customs & Border

16 agents, spoke with them and was allowed to leave the

17 airport.

18 A.   Yes.

19 Q.   Correct?

20      He left the airport.

21      He was asked to come back the next day, and he did so;

22 correct?

23 A.   Correct.

24 Q.   Okay.  Thank you.

25           MR. KELLEY:  I don't have anything further at this

29

1 time, Judge.

2          THE COURT:  All right.

3          MR. TOLKOFF:  Your Honor I apologize to the Court.

4 I had failed to move Government's 2, 3, 4 and 5 which have

5 been identified by the witness, and I would ask that they be

6 admitted at this point.

7          THE COURT:  Any objection?

8          MR. KELLEY:  Just with respect to 3, 4 and 5.

9 They're not photographs that she took, so I would object on

10 hearsay basis.

11          THE COURT:  Okay.  Overruled.  They're admitted.

12          MR. TOLKOFF:  Thank you, Your Honor.

13     GOVERNMENT EXHIBIT NOs. 2-5, MARKED & ADMITTED

14          THE COURT:  You can step down.

15          Any other evidence?

16          MR. TOLKOFF:  No, Your Honor.

17          THE COURT:  All right.  Mr. Kelley, do you want to

18 present any evidence?  I'm going to give you a chance

19 obviously to argue, but --

20          MR. KELLEY:  Yes, Judge.  I don't have any other

21 evidence other than referring the Court with respect to this

22 notion that his support would go away, that we filed the

23 financial affidavit, and I believe that it was some other

24 financial resources that are available to support Mr. Zheng

25 --

30

1            THE COURT:  Right.

2            MR. KELLEY:  -- so I --

3            THE COURT:  Just to be clear, the financial

4 affidavit is only seen by the Court.  No one else has seen

5 it.

6            MR. KELLEY:  Yes.  I understand that.

7            THE COURT:  Okay.

8            MR. KELLEY:  But I don't have any witnesses today,

9 Judge.

10            THE COURT:  Okay.  All right.  Just on the issue

11 of probable cause do you want to be heard?

12            MR. TOLKOFF:  If the Court wants to hear from the

13 Government, I'm happy to --

14            THE COURT:  I'm not sure I do.

15            Do you want to be heard on probable cause, Mr.

16 Kelley?

17            MR. KELLEY:  Just briefly, Judge.  I would say

18 that the important thing is what question was asked, how was

19 it asked and what his response was.  Because he's charged

20 with lying.  Knowingly, willfully lying.  And so I would

21 just argue to the Court that that basis hasn't been met out

22 by the evidence here today.

23            THE COURT:  Okay.  I find there's probable cause.

24 I do recognize, obviously, it's always going to be an issue

25 in a case like this whether the person who is asking the

1 questions and getting the answers has a level of proficiency

2 to understand the answers that are being given.  However,

3 it's been -- the record is that the -- there was a -- the

4 person who did the interview spoke Mandarin.

5          I would note also that the denials that he had

6 biological samples is consistent with the way things are

7 packaged here.  They are not in properly labeled packages

8 that say biological samples.  They are wrapped in plastic

9 and then hidden in a sock in a suitcase.

10          The statements as they've been testified to here

11 as well as the way they are represented in the affidavit are

12 consistent with the defendant's own actions, so I find

13 probable cause to support the charge of 1001.

14          Okay.  Mr. Tolkoff?  It's the Government's motion

15 on detention.  The burden is to establish by a preponderance

16 of the evidence that the defendant is a risk of flight and

17 no condition or combination of conditions will reasonably

18 assure his appearance.  I will consider the factors set

19 forth in 3142(g), and I'll hear you.

20                          ARGUMENT

21          MR. TOLKOFF:  And, Your Honor, as testified to by

22 Special Agent Spice, Mr. Zheng's sole status in the United

23 States is as a J-1 Visa holder.  Although because in some

24 part of the short period of time between Mr. Zheng's first,

25 I guess, discovery last week and also in part because this

1 matter's been under seal at the request of the Government,

2 not everything is known to Harvard University, not

3 everything is known to Beth Israel.  We have not been able

4 to have a complete fulsome discussion with some of the

5 stakeholders at those two organizations.

6          THE COURT:  I mean, I recognize that.  But it was

7 the Government that asked that it be sealed.

8          MR. TOLKOFF:  Understood, Your Honor.  The Court,

9 of course, is still permitted to make reasonable inferences

10 based on the evidence that has been presented, and it is, I

11 think, a completely reasonable inference that when somebody

12 is caught having admitted to stealing from an organization

13 for whom he worked, which is what has happened here, which

14 is what the testimony reflected this afternoon, that that

15 person will not be asked back to that organization.  I don't

16 believe that that is a stretch of the imagination.  I think

17 that is a fair inference from the Government that has been

18 presented.

19          And that if he is not allowed to continue working

20 in his capacity as a medical researcher, then he will not be

21 permitted to stay in the United States.

22          On that basis I don't see that he would continue

23 to be funded by the China scholarship council.  And of

24 course, as somebody who's no longer legally in the United

25 States, he would not be permitted to work.

1          Now, I have not seen what the Court has seen

2 regarding the financial affidavit, so I do not know what

3 other means Mr. Zheng may have.  But unless they are

4 considerable means to support him for what may be months'

5 long litigation, the Government would have very serious

6 concern that Mr. Zheng has only to go to New York to pick up

7 a new passport from the consulate, and of course the

8 Government has no control over whether the China consulate

9 would issue a new travel paper authorizing Mr. Zheng to

10 leave.  Mr. Zheng would have a hard time doing that from an

11 airport, but he may very well slip by border security

12 outbound from either the Canadian or the Mexican border

13 where he is then free to fly to China.

14          Mr. Zheng's sole purpose for being in the United

15 States as reflected by the testimony of Special Agent Spice

16 was to conduct research, and it is again a virtual certainty

17 that that is something he's no longer going to be welcome to

18 do as soon as this matter is better understood by the

19 parties for whom he was conducting that research.

20          Your Honor, I think on that basis it is certainly

21 proven by a preponderance, merely more likely than not.  I

22 think in this case it is a virtual certainty that Mr. Zheng

23 will not appear as required, because he will be either

24 somebody in the United States without legal status or he

25 will quite easily flee.

34

1          So, Your Honor, I don't see how any of the

2 evidence that's been presented today could support a finding

3 that Mr. Zheng is a good candidate for release.

4          THE COURT:  What do you say to the fact that he

5 was released on the 9th after these materials were

6 discovered and he was confronted with that, requested -- he

7 was released, requested that he return the following day,

8 and did so?

9          MR. TOLKOFF:  Your Honor, I think that that's an

10 interesting fact, and obviously I wouldn't insult the

11 Court's intelligence by claiming that it works in the

12 Government's favor, but I think it also should be taken in

13 context.

14          We don't know what Mr. Zheng knew at the time he

15 was allowed to leave the airport.  We don't know if Mr.

16 Zheng had an appreciation of how serious the trouble that he

17 was in is, and I think Mr. Zheng has a much clearer picture

18 of the trouble that he's in now.

19          The instant charge, Your Honor, is false official,

20 which is in violation of 1001.  But as the Court likely

21 inferred, based on Special Agent Spice's testimony there is

22 a high likelihood of additional charges here.  One is

23 smuggling.  Because Mr. Zheng secreted these samples in a

24 sock in his luggage in violation of 49 CFR, he can be

25 charged with a violation of Title 18 United States Code

1 Section 554 in addition to false official, because there's

2 no question that the vials in this case were not properly

3 packaged and not properly labeled as they should have been

4 as scientific research samples.

5          THE COURT:  I mean, that's true, but even if Mr.

6 Zheng did not understand or appreciate that his false -- his

7 denial that he had these samples might trigger 1001

8 liability, he knew that he stole these samples.  In fact, he

9 at his first interview before it's concluded, if I heard

10 Agent Spice's testimony correctly, he says I stole them from

11 Beth Israel.  And all those statements were made before he's

12 released and asked to return.  I think somebody in those

13 circumstances who makes that statement has a pretty good

14 idea that they face some significant legal issues, that they

15 may have jeopardized their job and their research

16 opportunity.

17          MR. TOLKOFF:  Your Honor, I don't disagree.  I

18 think the Court is absolutely right.

19          I think the question, though, is whether we can

20 draw the inference that Mr. Zheng fully appreciated the

21 gravity of his situation.  And I don't think we can, Your

22 Honor.  I think that at that point it's a fair assumption

23 that Mr. Zheng understood he was in trouble, but I don't

24 think it's a fair assumption that he understood that

25 effectively the whole basis for his presence in the United

36

1 States was about to crumble.  That is now quite clear.

2          On that basis, Your Honor, I think that there is a

3 much more urgent risk of flight in this case, but I think

4 that there are also other fears the Government has here.

5 The Government has not seen a request for additional charges

6 for either theft of trade secrets or for interstate

7 transportation.

8          THE COURT:  There are none.

9          MR. TOLKOFF:  And, Your Honor, the reason for that

10 is because currently we don't know what we have, and we have

11 only Mr. Zheng's word for what is in those samples.

12          In the coming weeks we hope to have more clarity

13 on what was in those vials, and at that point there's a very

14 high likelihood that additional charges will be brought.  So

15 things are simply going to get worse and worse for Mr.

16 Zheng.  And, of course, the urgency and the pressure for him

17 to flee is going to be greater and greater, and the basis

18 for him to stay is weaker and weaker.

19          On that basis, Your Honor, I think there is -- the

20 record was clearly demonstrated by a preponderance that he

21 is a risk of flight.

22          THE COURT:  Okay.  Thank you.

23          MR. TOLKOFF:  Thank you, Your Honor.

24          THE COURT:  Mr. Kelley?

25                         RESPONSE

1          MR. KELLEY:  Judge, I think the Court is right on

2 track with what Mr. Zheng was apparently facing when he came

3 back to the airport that day full well knowing what the

4 agents had in his luggage.  And I think the question here

5 whether he's a serious risk of flight, not that he's a risk

6 of flight, but a serious risk of flight, by a preponderance

7 of the evidence has not been met.

8          His passport has been taken.  There's pure

9 speculation that he'd somehow be able to get down to New

10 York to a consulate, get a passport, somehow slip by the

11 authorities and get out of the country.

12          What the Court has before it here is a charge of

13 making false statements.  What the Court has before it is a

14 29-year-old man, surgeon, a medical doctor who was doing a

15 fellowship, had been in the country for 16 months without

16 any problems whatsoever, has never had any bit of legal

17 trouble in his entire life, Judge.

18          Your Honor's able to observe him here in court in

19 both of these appearances, and I think he's been nothing but

20 respectful and understanding that this is a very, very

21 serious matter.

22          And I would say, Judge, one of the things that I

23 think gives him all the incentive to remain and continue to

24 work through this case is even if the Government's notion

25 that he's able to somehow slip the country had some basis,

1  it's not something that goes away from Mr. Zheng.  In the

2  study that Mr. Zheng's doing, in the research that he's

3  doing, I think it would have far reachinger implications for

4  his life going forward; meaning, that any international

5  travel I think would be tenuous at best.  And the type of

6  thing that he's doing, this research, it comes with it, I

7  think, presentations, various international conferences,

8  things that you do in this line of work in this study.  That

9  all would be implicated in addition to the shame that he

10  would carry with him when he goes back not having fully

11  resolved the legal situation here.

12          He did sit down with Pretrial Services, Judge.  I

13  believe that it was discussed in that report, as well, that

14  his wife had some additional funds.  I believe we had some

15  discussion in the interview that there were funds with which

16  he could pay this rent while this case is unfolding.

17          As he stands here by the Court today, there is no

18  effect on his J-1 Visa.  He is here.

19          And I think it's purely speculative what Harvard's

20  reaction will be once they learn what this is.  I don't know

21  whether it will be some sort of administrative investigation

22  or whether they'll immediately cease.  But I think it's

23  purely speculative, and I'd say that that's probably also

24  because nobody knows what this is.  Nobody knows how

25  valuable or important this is to the lab, what exactly it is

1  in terms of -- in terms of how their reaction will be to it.

2         So while clearly, you know, any logic would say

3  it's in jeopardy, I think it's purely speculation at this

4  point and not to the level of preponderance of the evidence

5  that he's going to lose that status.

6         And even if he did lose that status, Judge,

7  there's still precedent that says that that is not a basis

8  to detain somebody, the fact that they are present in the

9  country without status.  It certainly limits them in their

10  ability to work and limiting in other things.

11        But he does have a source of support here to

12  remain and continue to fight these allegations, continue to

13  see this case through to its logical conclusion.  But just

14  simply because if he lost his visa, that doesn't mean that

15  the Court is bound to detain him, that there's no other

16  reason to -- that there's nothing else that can be done.

17        What we're proposing to the Court is that he be

18  allowed to return to his one-bedroom apartment, that he be

19  on confinement, on electronic monitoring such that he

20  couldn't leave.

21        It's my belief that he'd be able to continue doing

22  some studying and so that he's not just sitting there

23  watching TV all day, but there would be things that he could

24  do, setting aside whatever's going to happen with Harvard

25  and Beth Israel, and that he would be able to continue to do

40

1  diligently:  study, work and do the things that he's been

2  doing.

3          I think a serious risk of flight, Judge, it is not

4  this gentleman.  He's a 29-year-old man who's spent the

5  better part of his life studying, going to medical school.

6  There's nothing before the Court beyond a fear that he's

7  going to take some extraordinary steps to evade the law

8  here, Judge, and I think that that's just not -- not what

9  the standard is.

10         THE COURT:  Well, I mean, I have a defendant

11 before the Court who clearly put his interests above his

12 employer's interest, and actually in some ways put a really

13 valuable relationship at issue.  Whether what he took is the

14 most valuable research Beth Israel has ever done or it's not

15 very important at all, he stole from Beth Israel.  I mean,

16 he's said so.  He's betrayed their trust.  He's put himself

17 above that.  He took samples for a friend or a colleague

18 back in China.

19         I wouldn't call it speculation to say he's not

20 motivated to get himself out of the country to avoid the

21 charges.

22         MR. KELLEY:  Judge, one additional thing I did

23 neglect to mention --

24         THE COURT:  Yes, sir.

25         MR. KELLEY:  -- that is mentioned in the Pretrial

41

1 Services report.  We did provide Probation with a copy of

2 his itinerary which did have a return flight of December 29.

3          THE COURT:  Okay.

4          MR. KELLEY:  He was due to come back to the

5 country.

6          THE COURT:  Okay.  All right.  Thank you.

7          MR. KELLEY:  Thank you, Your Honor.

8          THE COURT:  Mr. Tolkoff, it's your motion.  I'll

9 give you the last word.  Anything else?

10                         ARGUMENT

11          MR. TOLKOFF:  Your Honor, I would simply say that

12 I think speculation is to draw a conclusion based on either

13 scant or non-existent evidence, and that's not what the

14 Government's asking the Court to do.

15          The Government's asking the Court to draw

16 conclusions based on not only the evidence that has been

17 presented through Special Agent Spice but also based on the

18 Court's own life experience.  And I think that it is a fair

19 inference, not speculation, to say that Mr. Zheng's

20 relationship with Beth Israel and his relationship with

21 Harvard are about to disintegrate, at which point he will

22 have no lawful status in this country, will be subject to

23 removal, and he will also likely have no means of income

24 aside from possibly his wife.

25          His wife is, to the Government's knowledge,

42

1 totally blameless in all of this.  But she lives in

2 Bethesda, Maryland, so the only point of contact that the

3 Government is aware of that has been produced by the defense

4 as somebody who could potentially be a custodian or a

5 sureter is somebody who doesn't live in the District.

6         Your Honor, I don't believe that there's any

7 viable plan to keep Mr. Zheng in the United States in the

8 event that he is released.  All of the things that justify

9 his presence here are almost certainly going to vanish in

10 the very near future.

11         On that basis the Government would ask the Court

12 to detain him.

13         THE COURT:  All right.  I want to confer with

14 Pretrial Services for a couple of minutes.

15     (Recording stops from 12:19:20 to 12:39:44.)

16         THE COURT:  What was the defendant told on

17 December 9 as the reason he needed -- the reason to come

18 back on the 10th?

19         I mean, his flight was gone; right?  So what was

20 the --

21         I can't quite put it together why are you coming

22 back.

23         MR. TOLKOFF:  So, Your Honor, the Court is correct

24 that Mr. Zheng's flight was gone.

25         My understanding is that the Customs & Border

43

1  Patrol had Mr. Zheng's digital items, and that in order to

2  get them back he had to come back the following day.

3          Beyond that, just based on my very brief

4  discussion with Special Agent Spice at counsel table, she's

5  not aware of any more of the substance of the conversation

6  between CBP and Mr. Zheng on the 9th.

7          THE COURT:  So when he returned on the 10th, did

8  they give him the laptops back?

9          MR. TOLKOFF:  No.  At that point he was arrested,

10 Your Honor.

11         THE COURT:  Oh, okay.  All right.

12         I'm going to take the matter under advisement, and

13 I'm going to schedule a hearing on this matter.  I can

14 either do it --

15         I want to put it on for Wednesday morning at 9:30.

16         I just need to go through the materials.  There

17 are a lot of unanswered questions here.  I do note that the

18 defendant's roommate works at the same lab.  I doubt it's a

19 secret at the lab that the defendant has been arrested or

20 even what the circumstances of his arrest are.

21         I'm concerned, too, that the Pretrial Services

22 report indicates to the Court that the defendant had a very

23 specific purpose in traveling to China on December 9.  He

24 was not traveling with his wife.  He was coming back on

25 December 29.  So I'll hold on to the exhibits, and I will

44

1  see the parties on Wednesday, December 18, at 9:30.

2         Mr. Tolkoff, anything else?

3         MR. TOLKOFF:  No, Your Honor.

4         Your Honor, I would ask if the Court is willing to

5  simply maintain the matter under seal until close of

6  business today, so that I have an opportunity to confer with

7  my office leadership?  And if at that point if I can reach

8  out to the Court's deputy, because at that point I don't

9  think that there'd be any further reason to maintain the

10 matter under seal.

11        THE COURT:  In other words, before I would issue a

12 decision.

13        MR. TOLKOFF:  Yes.

14        THE COURT:  Okay.  Mr. Kelley?

15        MR. KELLEY:  Judge, just one additional thing.

16 Because the Government had mentioned that Mr. Zheng doesn't

17 have any other ties here in Massachusetts, I was going to

18 confer with Probation.  I believe that it was brought up in

19 the interview that there's an uncle of his wife who does

20 live in the Massachusetts area.  I wasn't specifically

21 proposing him as a custodian or anything like that, but I

22 just wanted to make sure that the Court was aware of that.

23 I'm going to confer with Pretrial Probation to see if my

24 memory is accurate.

25        THE COURT:  All right.  Well, I'm trying to make

*Judy Bond, CERT*
*Certified Federal Court Transcriber*
*judy@bondcourtreporting.com*

45

1  the right decision here.  If you want to explore that and

2  present that on Wednesday morning, I'll hear it.  If there's

3  something else the Government wants to raise on Wednesday

4  morning -- I'm not expecting a big rehash, but if there's

5  some discreet matter that one side or the other wants to

6  raise, I'll hear it, and I'll make it -- I'll hold off

7  making a decision until Wednesday morning.  All right?

8           MR. KELLEY:  Thank you, Your Honor.

9           MR. TOLKOFF:  Thank you, Your Honor.

10           THE CLERK:  Court stands in recess.

11      (Court adjourned at 12:46:36 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

46

1                              CERTIFICATION

2        I, Judy Bond, a court approved transcriber, certify

3   that the foregoing is a correct transcript from the official

4   electronic sound recording of the proceedings in the

5   above-entitled matter.

6

7

8   _____  January 26, 2020
     Judy Bond
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Judy Bond, CERT*
*Certified Federal Court Transcriber*
*judy@bondcourtreporting.com*