### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA, ) CRIMINAL NO. 1:19-mj-04532-DHH-1
     Plaintiff,           )
                          )
                          ) BOSTON, MASSACHUSETTS
          v.              ) DECEMBER 18, 2019
                          )
ZAOSONG ZHENG,            )
     Defendant.           )
                          )
```

TRANSCRIPT OF DETENTION HEARING CONTINUED
BEFORE THE HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:   UNITED STATES ATTORNEY'S OFFICE
                      BY: Benjamin Tolkoff, AUSA
                      One Courthouse Way, Suite 9200
                      Boston, MA 02210
                      617-748-3183
                      benjamin.tolkoff@usdoj.gov

For the Defendant:    Brendan O. Kelley, Esq.
                      Federal Defenders Office
                      51 Sleeper Street, 5th Flr.
                      Boston, MA 02210
                      617-223-8061
                      brendan_kelley@fd.org

Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

1                            **I N D E X**

2   **ARGUMENT**                                    17

3   **RESPONSE**                                    21

4   **ARGUMENT**                                    26

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Judy Bond, CERT*
*Certified Federal Court Transcriber*
*judy@bondcourtreporting.com*

3

1  COURT CALLED INTO SESSION

2  (9:19:26 A.M.)

3          THE CLERK:  ... for the District of Massachusetts

4  is now in session, the Honorable David Hennessy presiding.

5          Today is December 18, 2019.  We're on the record

6  in the matter of the United States vs. Zaosong Zheng.  It is

7  Docket 19-4532.

8          Counsel, please identify themselves for the

9  record.

10          MR. TOLKOFF:  Your Honor, good morning.  Ben

11  Tolkoff for the United States.

12          THE COURT:  Good morning.

13          MR. KELLEY:  Good morning, Your Honor.  Brendan

14  Kelley for Mr. Zheng, who's to my right.

15          THE COURT:  Good morning.

16          Swear in the interpreter.

17          THE CLERK:  Will you please raise your right hand?

18      GOVERNMENT INTERPRETER SWORN

19          THE CLERK:  Please state and spell your name for

20  the record.

21          THE INTERPRETER:  Yes.  For the record, Simon

22  Chan.  C-H-A-N last name.  Thank you.

23          THE COURT:  Good morning.

24          THE INTERPRETER:  Thank you, sir.

25          THE COURT:  You all can be seated.

4

1          Does the Government wish to present any other

2 evidence or information?

3          MR. TOLKOFF:  Yes, Your Honor.  Your Honor, as we

4 left it on Monday morning, the Court had some additional

5 questions about, first, how it was left with Customs &

6 Border Patrol and the defendant before he left Logan on

7 December 9, whether Mr. Zheng's position at Beth Israel

8 would be terminated as a result of the admitted misconduct

9 during his post arrest statements, and the specifics of the

10 lease at 400 Longwood.

11          Special Agent Spice has additional information on

12 all of those issues, if I may re-call her.

13          THE COURT:  Yeah, sure.  Go ahead.

14          Dawn, hang on for one second.

15          If you're here on Richard Work (phonetic), I don't

16 know that we're going to get the hearing done at 9:30, as

17 we're starting when we are.  And my understanding is his

18 counsel has a hearing at ten o'clock somewhere else, so

19 you're welcome to come back in like 20 minutes or half an

20 hour if you want, and I'll see if I can squeeze the matter

21 in.  I'm sorry.  Richard Warwick (phonetic).  But I'm not

22 confident that's going to happen.  I'm sorry.

23          ATTORNEY:  Thank you, Your Honor.

24          THE COURT:  Sure.  Go ahead.

25     GOVERNMENT WITNESS SPECIAL AGENT KARA SPICE SWORN

*Judy Bond, CERT*
*Certified Federal Court Transcriber*
*judy@bondcourtreporting.com*

5

```
1              THE CLERK:  Please state and spell your name.

2              THE WITNESS:  Kara Spice, K-A-R-A; last name

3  Spice, S-P-I-C-E.

4                      DIRECT EXAMINATION

5  BY MR. TOLKOFF:

6  Q.   Special Agent Spice, between Monday and today have you

7  learned additional information about the nature of the

8  interview conducted by Customs & Border Protection -- excuse

9  me -- Border Patrol and Mr. Zheng?

10 A.   Yes, I have.  I was able to conduct an interview

11 yesterday.  I believe CBP -- or Customs & Border Patrol

12 officer James Cane (phonetic).

13 Q.   And what did you learn from Officer Cane (phonetic)?

14 A.   I learned the nature of the encounter with Mr. Zheng

15 December 9, as well as how it was left with him at the end

16 of the interview when he was allowed to leave Boston Logan

17 Airport.

18 Q.   And first, was there a Mandarin speaker present during

19 the course of the interview with Customs & Border Protection

20 on -- or excuse me.  I keep saying that.  I apologize.  --

21 Border Patrol on December 9?

22 A.   Yes.  Officer Lin (phonetic) was also present during

23 the interview.

24 Q.   And Officer Lin (phonetic) is a Mandarin speaker?

25 A.   Yes, he is.
```

6

1  Q.   And based on your interview of Officer Cane (phonetic),

2  how, to your knowledge, did Customs & Border Patrol leave it

3  with Mr. Zheng before he left Logan on December 9?

4  A.   So on December 9 he -- the interview was concluded,

5  however, under CBP's authorities they retained his digital

6  items:  his laptop, his phone and a thumb drive.  So two

7  laptops, a thumb drive and a phone.  And he was instructed

8  that when he rescheduled his flight for December 10, that he

9  should come back to the airport and claim those items.  He

10 may not be able to claim them under CBP's -- what CBP's

11 decision would be, but he was walked out of the Terminal E

12 area, a CBP controlled area, shown the desk where he could

13 pick up those items or let them know he was there, and he

14 was expected to show up several hours prior to his December

15 10 departure, which it was believed that he would

16 reschedule.

17 Q.   Now, on December 10, to your knowledge, did Mr. Zheng,

18 in fact, have a rescheduled flight to China?

19 A.   Yes, he did.  I (inaudible) the interview (inaudible)

20 that the FBI is privy to and I was able to determine that he

21 did have a flight, Hainan Airlines 7962, scheduled to depart

22 at 3:45 p.m. on December 10 from Boston Logan Airport.

23 Q.   And Special Agent Spice, regarding the lease, Mr.

24 Zheng's lease at 400 Brookline Ave., Apartment 8A, were

25 there additional facts learned about the nature of that

1 lease between Monday and today?

2 A.   Yes.  So Special Agent Andrew King went to the manager

3 of the Longwood Gallery Apartments property -- assistant

4 property manager, and interviewed her, Ms. Jan Bates, on

5 December 13, and he learned that on December 11 Mr. Zheng's

6 roommate, Jaolin Lee (phonetic) came down to notify the

7 front office that he would be returning to China at the end

8 of the month, and that him and -- both him and Mr. Zheng

9 would be moving out at the end of the month.  And he

10 introduced a new individual who'd be taking over the

11 remaining portion of the lease.

12 Q.   And so based on the property manager's understanding of

13 Mr. Zheng's lease, Mr. Zheng's lease at that apartment ends

14 at the end of this month.

15 A.   Correct.

16 Q.   Now, regarding Mr. Zheng's position at Beth Israel, has

17 the FBI generally learned in broad strokes if somebody were

18 have found to have stolen biological specimens from a lab at

19 Beth Israel, what to your knowledge would happen to that

20 employee?

21 A.   From what we were able to learn, it depends on the

22 individual circumstances, but in general, Harvard would

23 probably withdraw their petition for this person to continue

24 to be a J-1 scholar, a research scholar at the university

25 and it's extended laboratories.  In this case, Beth Israel.

8

1  Q.   All right.   So Harvard would withdraw its sponsorship

2  of Mr. Zheng's visa in the event that it were to be learned

3  that he had stolen from the Beth Israel lab; is that

4  accurate?

5  A.   Correct.

6          MR. TOLKOFF:  Your Honor, I have no further

7  questions of the witness.

8          THE COURT:  Okay.  Do you want to ask any

9  questions?

10          MR. KELLEY:  Yes, sir.

11                    CROSS-EXAMINATION

12  BY MR. KELLEY:

13  Q.   Special Agent, with regard to the discussion that you

14  had with CBP Officer King, he related to you that they spoke

15  with Mr. Zheng at the airport; right?

16  A.   Correct.

17  Q.   And that they related to Mr. Zheng that he was not

18  going to be able to take his electronics that they had

19  seized; correct?

20  A.   Correct.

21  Q.   And you're aware and you spoke with Agent King about

22  the fact that they had found this apparently biological

23  material in the suitcase; right?

24  A.   Correct.

25  Q.   And they had spoken to Mr. Zheng about that; correct?

1  A.    They asked him to identify the materials.

2  Q.    Okay.  So it stands to reason that Mr. Zheng was aware

3  that they had seen those materials, as well; correct?

4  A.    Yes.  They looked at them together.

5  Q.    It's obvious.

6        And so Mr. Zheng to Special Agent king's report to you

7  was not allowed to leave with that biological material --

8  A.    No.

9  Q.    -- or apparently biological material.

10  A.    Those materials, because of their biological nature and

11  the hazardous materials, were seized by Customs & Border

12  Patrol.  And due to how we work with the airport in general

13  with CBP regardless of the individual, the FBI then does

14  come and properly package the materials and ship them to a

15  laboratory for proper storage and identification and

16  analysis.

17  Q.    Okay.  And so at the time that Mr. Zheng left the

18  airport, according to the report of Officer King, he knew

19  that the items of apparent biological material had been

20  discovered and his electronics had been seized; correct?

21  A.    Correct.  The items had been taken from him, and he was

22  actually going to make a deposit -- or a slip for a receipt

23  for the digital items.

24  Q.    Okay.  You said that Special Agent King spoke to the

25  apartment where Mr. Zheng currently resides; correct?

1  A.   Correct.

2  Q.   So that I'm clear, again, when exactly is it that Mr.

3  Zheng is, according to the apartment manager, supposed to be

4  vacating the apartment?

5  A.   According to his roommate, Mr. Lee (phonetic), they

6  would be moving out at the end of December.

7  Q.   At the end of December.

8  A.   December 31.  A specific date wasn't given.  It was

9  just the end of December.

10 Q.   Okay.  Do you know from Special Agent King's report to

11 you or just from general knowledge whether this apartment

12 building is frequently utilized by visiting students in the

13 manner that Mr. Zheng was there?

14 A.   I'm not aware of that.

15 Q.   Okay.  This is an apartment that --

16      Whether you're aware or not, is it --

17      Where is it exactly in Boston?

18 A.   It's in the Longwood medical area.

19 Q.   Okay.

20 A.   400 Brookline, I believe.

21 Q.   Okay.

22 A.   Apartment.

23 Q.   So it's near medical centers, near where designated

24 students might be working; would that be fair?

25 A.   That would be fair.

11

1 Q.   Okay.  And obviously Mr. Zheng's visa does not expire

2 until the end of April or May roughly.

3 A.   I don't know the specific date but definitely into

4 2020.

5 Q.   It doesn't expire in January, for example.

6 A.   No.

7 Q.   Right?

8     Do you happen to be aware of when the current roommate

9 of Mr. Zheng's visa is expiring?

10 A.   The current roommate?

11 Q.   Yes.  I forget his name.

12 A.   (inaudible) that information.  Let me see if I have it

13 with me today.  I'm saying this, because I did review his

14 invitation from Harvard.

15 Q.   Yes.

16 A.   (inaudible) Beth Israel.

17          THE COURT:  When you say "his," are you talking

18 about Mr. Lee (phonetic), or are you talking about Mr.

19 Zheng?  That's my question.

20          THE WITNESS:  Oh, I've seen them both.  I'm sorry,

21 sir.

22          THE COURT:  That's okay.

23          THE WITNESS:  Both Mr. Lee (phonetic) and Mr.

24 Zheng.

25          THE COURT:  Okay.

12

1  A.   Actually, here's his September 6, 2017, for Mr. Lee

2  (phonetic), his invitation from Beth Israel as under Harvard

3  Medical School.  Through January 2020 for Mr. Lee

4  (phonetic).

5  Q.   Okay.

6  A.   And through September 2, 2020, for Mr. Zheng.

7  Q.   Okay.  So Mr. Lee (phonetic) was already having his

8  visa expire relatively soon to when he told the apartment

9  that he was leaving; right?

10 A.   Yes.

11 Q.   And that another individual was going to come take over

12 the lease, because the lease was continuing forward;

13 correct?

14 A.   Correct.

15 Q.   Okay.  Now, there had been some contact with counsel

16 for Beth Israel Deaconess; correct?  You had testified to

17 that.

18 A.   Correct.  Not me personally.

19 Q.   Not you personally.

20 A.   But another agent.

21 Q.   But another agent contacted them.

22      As we sit here right now, they have not rescinded Mr.

23 Zheng's visa; is that correct?

24 A.   Not that I'm aware of.

25 Q.   And they were not able to say definitively what would

13

1 happen, correct, to Mr. Zheng's visa?

2 A.   We couldn't speak directly or -- you know, as far as

3 Mr. Zheng specifically.

4 Q.   Okay.

5 A.   So it was kind of a (inaudible) just a theory.

6 Theoretical question.

7 Q.   Did you or any other agents have occasion to speak with

8 Dr. Wei who is the sponsor of the lab that Mr. Zheng was

9 working in?

10 A.   Not yet.

11 Q.   Not yet.  Okay.  All right.

12        MR. KELLEY:  I don't believe I have anything

13 further at this time.

14        THE COURT:  Okay.  Thank you.  You can step down,

15 Agent.  Thank you.

16        Do you have anything else you want to present?

17        MR. TOLKOFF:  Not by way of evidence, Your Honor.

18        THE COURT:  All right.  Mr. Kelley, do you want to

19 present any evidence?

20        MR. KELLEY:  Judge, I do have some additional

21 information that I provided to Probation yesterday, and I

22 would move by way of proffer on that.

23        THE COURT:  Go ahead.

24        MR. KELLEY:  There is an individual, a Yonking Zsu

25 (phonetic) who is a very close family friend of Mr. Zheng's

14

1 wife's parents.  Essentially, Mr. Zsu (phonetic) and Mr.

2 Zheng's wife's parents were teenagers together, went to

3 school together, they remain close.

4         Mr. Zsu (phonetic) is a manager at Procter &

5 Gamble Gillette here in Boston.  He has been with the

6 company, to my understanding -- and I confirmed this with

7 him -- for about 18 years.  He and his wife were recently

8 relocated to Germany in about 2017.  Previous to that

9 relocation I've confirmed that they had property in

10 Medfield.  They owned a house in Medfield and sold that

11 contemporaneous with his reassignment to a facility in

12 Germany with Procter & Gamble Gillette.

13         They have recently within the past few months

14 moved back to Boston and are in the process of looking for a

15 home.  Currently, they rent a two-bedroom, two-bath

16 apartment.  My understanding is that it's a very small

17 apartment.  However, in speaking with Mr. Zsu (phonetic), I

18 confirmed that when they do have a home, when they do have

19 space for Mr. Zheng, he is more than welcome to stay with

20 them.  I don't have a timetable on when they would be

21 purchasing a home.

22         The other additional complication, because it was

23 a two-bedroom home, I was wondering about that, they have

24 two daughters who will be returning over the holiday period

25 and will be staying at the apartment.  So currently right

1 now there's just no space for Mr. Zheng at that apartment.

2          And so at this time he still has his lease back in

3 the apartment that he was currently residing in.  That

4 apparently by the information from the apartment company is

5 expiring in January.  I'm informed by his wife that there

6 was actually an intention that he was going to become

7 roommates with another individual who's coming from China to

8 study who Mr. Zheng had studied with in 2009.  That

9 individual is a Mr. Lee (phonetic) Liu, L-I-U.  They

10 currently don't have a lease, but their intention was that

11 they were going to find a place to live prior to all this

12 occurring.

13          So as it stands right now, Judge, I would

14 additionally say that I spoke to Mr. Zsu (phonetic), the

15 uncle -- and again, I say "uncle," because that's a term of

16 art.  That's how they view this relationship.

17          THE COURT:  We're talking about the same person,

18 though.

19          MR. KELLEY:  The one who works for Gillette.

20          THE COURT:  Gillette.  Okay.

21          MR. KELLEY:  And he is willing to post a monetary

22 bond for Mr. Zheng.  I would suggest $15,000 to ensure his

23 appearance here in Court.

24          In speaking with his wife, Judge, Mr. Zheng would

25 still be able to work on his Ph.D. thesis.  He essentially

1 is a Ph.D. student, was due to complete that program

2 sometime in the spring.  But in the interim, though he can't

3 work for Beth Israel is I think a fair assumption at this

4 point, he would still be able to work on his Ph.D. thesis.

5 He does have work that he would be able to do there in terms

6 of writing it basically.

7          THE COURT:  Okay.  So you're just talking about

8 something that's going to occupy his time.

9          MR. KELLEY:  Something to occupy his time; that's

10 correct.

11          THE COURT:  Okay.

12          MR. KELLEY:  So my -- I think those were the

13 additional facts that I had proffered to Probation

14 yesterday.

15          I had a chance to actually speak with Dr. Wei

16 yesterday, and he referred me to I think the same law firm,

17 that Beth Israel's essentially saying he didn't know what

18 was going to happen.  And that he knew Mr. Zheng to be a

19 hard worker, to, you know, work in the lab extensively and

20 was not a problem to his eyes previously.

21          Other than that, Judge, I would just have

22 argument.

23          THE COURT:  Okay.  I'll hear you in a second.

24          May I speak to Pretrial?

25      (Pause in the proceedings.)

17

1          THE COURT:  Mr. Kelley, where is the apartment

2 that the -- I'm calling him the uncle -- lives?

3          MR. KELLEY:  I believe it's in Boston, Judge.  I

4 don't have the exact address right now.

5      (Pause in the proceedings.)

6          MR. KELLEY:  Judge, Mr. Zheng's wife has actually

7 been sleeping at the apartment.  She says it's outside the

8 Broadway Station.  She doesn't remember the exact street

9 address, but we can certainly provide that to the Court.  I

10 can contact Mr. Zsu (phonetic).

11          THE COURT:  Okay.  I'll hear you on argument.

12                       ARGUMENT

13          MR. TOLKOFF:  Your Honor, I think the fact that

14 Mr. Zheng had a flight out on December 10 is a sea change

15 based on what we learned on Monday by the Government's

16 admission.  The fact that Mr. Zheng was permitted to leave

17 after the vials in his luggage were discovered on December 9

18 was a fact that cut against the Government.  It is

19 significantly less powerful for the defendant when by virtue

20 of the evidence it would appear that he thought he was going

21 to be able to pick up his computers and fly back to China

22 the very next day.

23          THE COURT:  Well, isn't it -- at least the way it

24 was presented to me, wasn't he told, look, if you return to

25 Logan tomorrow to fly -- tomorrow being the 10th -- to fly

18

1 out of the country, this is where you go if you want to pick

2 up your two laptops, thumb drive and iPhone?  I mean, he

3 wasn't told you can't go somewhere.

4          MR. TOLKOFF:  True.

5          Your Honor, a couple of things.  First, whether

6 the exact nature of the phrase -- because we're dealing with

7 as it was relayed to Special Agent Spice and of course the

8 conversation was happening in Mandarin, so I don't want to

9 rely too heavily on the exact verbiage, but the Court is

10 absolutely right.  The reasonable interpretation of the

11 evidence could be that Mr. Zheng should be getting a flight

12 the following day.  But of course all of that speaks to Mr.

13 Zheng's understanding of the gravity of his circumstances,

14 and so he quite reasonably believed on December 10 that he

15 would be able to pick up his machines and leave the country.

16          He's now in a position in the event this Court

17 releases him where he can not leave the country, and that is

18 a massive change based on what his understanding was when he

19 walked into Logan on December 10.

20          The evidence as set forth from Mr. Kelley as to a

21 relevant plan appears highly tentative.  There's an

22 apartment -- or residence by a close friend of the family

23 who Mr. Zheng considers an uncle who does not currently have

24 room for Mr. Zheng but is currently looking for housing that

25 may have sufficient space for Mr. Zheng.

1          Of course, as the Court knows, a criminal matter

2 in federal court frequently takes many months often upwards

3 of a year to resolve.  So a tentative release plan to a

4 residence that has yet to be established with a close friend

5 of the family who currently doesn't have space for Mr. Zheng

6 seems like a real risk.

7          On the other hand, Your Honor, I spoke with

8 Christine Savage.  She's an attorney for Choate Hall &

9 Stewart, spoke with her last night.  And because of the

10 sealed nature of the complaint, I didn't explain exactly

11 what Mr. Zheng had relayed to agents or to the Customs &

12 Border Patrol, but I did ask her pointblank if somebody is

13 caught stealing from Beth Israel, what is the position of

14 Beth Israel regarding that person's continued employment, --

15          THE COURT:  I got that.

16          MR. TOLKOFF:  -- and she unequivocally --

17          THE COURT:  I assume he's going to be fired.

18          MR. TOLKOFF:  Exactly.

19          THE COURT:  He's not going to be permitted to

20 return.  That's the operating assumption here.  I don't

21 think the defendant's arguing otherwise.

22          In terms of --

23          You know, because of the nature -- the sealed

24 nature of the complaint, that's the Government's decision.

25 They wanted to seal this up.  I'm sure there are really good

20

1 reasons for it.  I'm not questioning the wisdom of that.

2 But I'm just saying the reason nobody's gone to Beth Israel

3 to say, "Hey, this guy got caught stealing.  What are you

4 going to do about it," is because the Government wants to

5 keep it under seal.  I mean, that's why we don't have an

6 answer.

7          MR. TOLKOFF:  That's correct, Your Honor.  Except

8 that the answer is virtually certainly to be Mr. Zheng's

9 going to lose his job.

10          But of course the Court is right.  The situation

11 as it would then unfold as the Court is aware, is that Mr.

12 Zheng loses his visa.  He becomes somebody who is in the

13 United States without lawful status.  That means that

14 immigration proceedings against him would have to begin.

15 Whether he would be detained or bailed in immigration court

16 of course we can't say.  In the event that he were detained

17 in immigration court, he would be deported or removed as

18 quickly as the deportation proceedings can go, frequently

19 far faster than criminal proceedings, which would mean in

20 all likelihood in the event that this Court were to release

21 Mr. Zheng, there's a high likelihood he would be removed

22 from the United States before the criminal proceeding could

23 conclude, and we would essentially have to dismiss this

24 case.

25          So the Government's concern here is significant.

1 Mr. Zheng, although he might be able to continue working

2 toward his Ph.D. thesis which is a laudable activity, it's

3 not one that pays.  And so he would have no means of income,

4 living in a place that is as yet to be defined.  Because

5 currently, as proffered by Mr. Kelley, his uncle who's a

6 good friend of the family doesn't have a place for him to

7 live.  Maybe Mr. Zheng's wife is currently looking for a

8 spot; but again, that's tentative.

9          As we stand here today, Your Honor, it is a

10 virtual certainty that Mr. Zheng will not be here for the

11 adjudication of the current charges, let alone anything else

12 that might be brought in the event that he's released.

13          So on that basis, Your Honor, we ask that he be

14 detained.

15          THE COURT:  Okay.  Thank you, Mr. Tolkoff.

16          Mr. Kelley?

17                         RESPONSE

18          MR. KELLEY:  Judge, I would say this.  With

19 respect to the visa issue, I think it is a fair assumption

20 that he's going to lose his job, that Harvard is not going

21 to sponsor his visa.

22          But be that as it may, I don't think that that

23 under case law is a proper basis to detain him.  The fact

24 that he is out of status and may impact in some way a risk

25 of flight, but it's not a basis to detain him.  And I'm

22

1 happy to brief the issue to the Court.

2          THE COURT:  You don't need to.  My view is -- at

3 least my understanding of the law is it's not dispositive,

4 but of course it's a factor the Court has to consider.

5          MR. KELLEY:  And what I would say to the Court is

6 this.  That the Government has chosen to proceed by a

7 criminal proceeding at this point.  Mr. Zheng is respectful

8 of the Court.  He is willing to put up a monetary bail.  He

9 would be on a electronic monitoring so that -- with an

10 exclusion zone around airports.

11          What we're talking here is whether the Government

12 has established a serious risk of flight and whether a

13 combination of conditions or a condition would ensure his

14 appearance.  Combining the monetary bail that Mr. Zsu

15 (phonetic) is willing to put up, Mr. Zheng's being on

16 electronic monitoring, I think both of those can reasonably

17 assure the Court that he would appear at any court

18 proceeding.

19          I'd remind the Court what we have here is a

20 29-year-old individual, surgeon, medical doctor, with no

21 criminal history.  Apparently, we've heard no testimony that

22 there was any suspicion of Mr. Zheng previous to this or any

23 sort of underlying reason to suspect that he was going to

24 leave.

25          I'd remind the Court again that he did have a

23

1  flight coming back on November -- or excuse me -- December

2  29, so that had always been his intention was to go to China

3  and have meetings I believe with the people at his

4  university in China and then return back here to continue

5  his Ph.D. work.

6           THE COURT:  Yeah.  When he made the reservation,

7  he wasn't charged in a complaint with a felony, and he

8  wasn't caught stealing from his employer, his J-1 Visa

9  wasn't in jeopardy.  I mean, --

10           MR. KELLEY:  And at this point --

11           THE COURT:  -- let's not ignore the reality here.

12           MR. KELLEY:  Well, and at this point, Judge, he

13  was aware of what was found in his luggage, and he came back

14  to the airport.  Certainly if he was going to try and flee

15  the country, there are other things that he could have done

16  if he wanted to try and hide from the fact of all this.

17           At this point, Judge, as we stand, I don't know

18  what the state of the evidence is going to be in the case

19  and how serious these materials are or anything like that or

20  what other communications were being had, but the bottom

21  line is what we're talking about is serious risk of flight

22  and a combination of conditions that can ensure his release.

23           The monetary bail is certainly significant, and

24  it's significant because it's coming from the family of Mr.

25  Zheng's wife, and he would be putting that on the line for

1  them if he did any kind of shenanigans or tried to leave.

2         If he's on an electronic bracelet, we can

3  establish an exclusion zone so that it would be known that

4  he's trying to leave the country and he could be

5  intercepted.  All those things can reasonably assure his

6  appearance before the Court, in addition to who he is,

7  Judge, in addition to the fact that he is a person without

8  any criminal history whatsoever and has a lot on the line.

9         As I said in our hearing the other day, to my

10  understanding Mr. Zheng is, you know, a researcher doing

11  work, studying cancer looking at cells, and any sort of

12  going forward without this being resolved I think impacts

13  his life completely going forward; being able to attend

14  conferences, being able to consult with other doctors.  And

15  all those things are on the line if he doesn't take

16  responsibility and see this case through to its conclusion,

17  whatever that may be.  I'd say he certainly understands

18  that.

19         He's respectful of the Court.  He's willing to

20  abide by any condition that the Court sets, and I'm arguing

21  that there are conditions here that can reasonably assure

22  his appearance in court.

23         THE COURT:  Can you just explain to me, so what's

24  the financial proposal?  Is it Mr. Zheng who's on the line?

25  He's going to borrow -- he's basically going to get $15,000

1 from the uncle, post that as part of security for his

2 appearance?  Is that what --

3           MR. KELLEY:  As part of security for appearance or

4 performance if the Court thought that --

5           THE COURT:  Okay.

6           MR. KELLEY:  -- that would be necessary, as well.

7           THE COURT:  All right.

8           MR. KELLEY:  And obviously willing to check in

9 with Probation whenever that would be required.

10          THE COURT:  All right.  Thank you.

11          MR. KELLEY:  And I would just say this.  At this

12 point the damage to Mr. Zheng in terms of detention going

13 forward is, I think, catastrophic.  This is an individual

14 who's never been detained, never been in jail --

15          THE COURT:  Mr. Zheng.

16          MR. KELLEY:  Mr. Zheng, yeah, excuse me.  Mr.

17 Zheng.  Is catastrophic.

18          This is not a world that he is accustomed to, and

19 at this point there are definitely conditions I think that

20 can reasonably assure his appearance, and I would just rest

21 on that, Judge.

22          THE COURT:  Okay.  Thank you.

23          Mr. Tolkoff, I'll give you the last word if you

24 want it.

25                         ARGUMENT

26

1          MR. TOLKOFF:  Your Honor, Mr. Kelley refers to

2 some of the recent litigation of defendants who are

3 illegally in the United States.  The Court's understanding

4 is my understanding, which is that Mr. Zheng's status is a

5 factor to be considered.  The Government's position is, of

6 course, is that in this case it should be considered quite

7 strongly, but it's not dispositive.

8          There are two cases of which I am aware in which

9 this issue recently came up in this District.  One is the

10 Alzeri (phonetic) case before Judge Casper.  The Alzeri

11 (phonetic) case is entirely different for a very important

12 reason, and that's that Mr. Alzeri (phonetic) is seeking

13 asylum in the United States.  And what that says is, first,

14 that Mr. Alzeri's (phonetic) asylum claim will run its

15 course which takes months frequently, longer than a criminal

16 proceeding to resolve.  Second is that Mr. Alzeri (phonetic)

17 by virtue of seeking asylum in the United States is claiming

18 a fear of return to his country of origin.

19          None of that is present here.

20          There was another case that happened before Judge

21 Bowler recently, and it was case that I prosecuted.  The

22 defendant was a Dominican National with no status in the

23 United States.  He, however, had a United States citizen

24 wife and a United States citizen child.  On that basis Judge

25 Bowler released him.  The suspicion being that somebody with

1 a kid and a spouse in the United States would stick around

2 to be close to their family.

3          There is no case, at least that I've prosecuted,

4 in which the defendant has such thin ties to this community

5 as we have seen with Mr. Zheng.  His ties --

6          As soon as he loses his job, and we know that he

7 will, as soon as he loses his J-1 Visa, and we know that he

8 will, his ties will be virtually non-existent.

9          The speculation that Mr. Zheng will face negative

10 consequences in his career by virtue of fleeing before he

11 resolves these charges I think is exactly that.  It is

12 purely speculative.  We have no evidence that Mr. Zheng will

13 not live very well in China if he were to return to China

14 upon release of this Court.

15          THE COURT:  Will not be well?

16          MR. TOLKOFF:  Excuse me.  I apologize, Your Honor,

17 if I misspoke.

18          We have no evidence that his life will be in any

19 way harmed by virtue of the unresolved charges in the United

20 States if he were to return to China.  Mr. Zheng has an

21 advanced degree.  It's perfectly reasonable that he could

22 live a very comfortable life with this matter totally

23 unresolved and simply never return to the United States.

24          So, Your Honor, I think we have a highly tentative

25 plan about where he's going to be housed; we have a $15,000

1 proposal which is not a short amount of money, but it's not

2 a ton of dough if you're afraid of going to prison; and we

3 have a final comment about, well, this is going to be hard

4 for Mr. Zheng.

5          I find that hard to stomach, Your Honor.  I think

6 that detention is difficult for anyone detained.  I think

7 that we shouldn't be reluctant to detain somebody simply

8 because he comes from a position of affluence and academic

9 privilege relative to another defendant who doesn't.  So I

10 think that line of argument should be discredited in its

11 entirety.

12          At the end of the day, Your Honor, I think if this

13 defendant is released, it is a virtual certainty that he's

14 gone, and the case against him goes with him.

15          THE COURT:  All right.  Just to pick up on that

16 last note, I don't understand the argument to be that

17 because Mr. Zheng has the benefit of an education or perhaps

18 other privileges, that he gets -- that there's some status

19 assessment that's made.  Oh, you know, you're well educated

20 so you get released.

21          But obviously one of the things the Bail Reform

22 Statute requires a Court to consider is someone's

23 background.  And things like whether they have an education,

24 whether they have a career, are matters that are squarely

25 relevant to an assessment of whether or not they are a risk

1 of flight or not.

2          This is a very close call.  I do find that the

3 Government has established by a preponderance of the

4 evidence that the defendant poses a risk of flight, but I

5 agree that there is a combination of conditions that can be

6 fashioned that will at least reasonably assure the

7 defendant's appearance.

8          In coming to this conclusion, I've considered the

9 factors in 3142(g).  It's actually a very close call.  I'm

10 required to consider the nature and circumstances of the

11 offense charged, and I do that.  The defendant is charged

12 with making false statements to Customs & Border Patrol

13 agents.  He faces up to five years in jail.  That's

14 certainly serious conduct, and the circumstances of it are

15 serious conduct.

16          He stole from his employer, has jeopardized if not

17 completely torpedoed his research opportunity.  He's

18 embarrassed Harvard University.  He's embarrassed Beth

19 Israel Deaconess Medical Center.

20          He's also put in jeopardy the entire program in my

21 view.  When things like this happen, it causes schools,

22 medical centers, to consider whether the program can

23 tolerate the risks of dishonesty, which this defendant has

24 admitted to involving himself in.

25          I'm required to consider the weight of the

1  evidence.  The case is strong.  It's not overwhelming, but

2  there was a Mandarin interpreter present when the defendant

3  denied possessing these vials, and as the Court noted on --

4  when we were last together, that denial is consistent with

5  the defendant's conduct.

6          These vials were packaged in a sock.  They were

7  concealed.  It makes perfect sense that the defendant's

8  first response to any question was I don't have anything

9  like that, because he obviously believed that he could

10 smuggle these items out of the United States without their

11 being detected.

12         A defendant was not on any type of supervision at

13 the time of the offense or his arrest.

14         I don't have information -- reliable information

15 on the nature and circumstances of a danger that may be

16 imposed to a community or any other person by the

17 defendant's release.  We just don't know enough.  We don't

18 know well what was going on here.  Was this private research

19 with some extremely altruistic or good motives, curing

20 cancer in another country, or is this a defendant stealing

21 because he wants to write an article, make himself famous

22 and make himself rich at the expense of Harvard, Beth Israel

23 Deaconess Medical Center and a lot of people who are

24 involved in what sounds like a really meritorious program.

25 So I don't have that information.

1            So it comes down to the defendant's

2 characteristics that I'm looking at.  He does have a good

3 education.  He does have some ties in the United States.

4 His wife who was in court the other day, who's here today,

5 who herself is a researcher in Maryland, is in the United

6 States.  And apparently he has a person I'm going to refer

7 to as the uncle who has sufficient confidence in the

8 defendant, that he has offered to open his home to the

9 defendant beginning in January and who has offered to post a

10 not insubstantial amount of money -- or loan that money to

11 the defendant so it could be posted.  $15,000.  If the

12 defendant flees, that money's gone.

13            I do agree that somebody who's facing five years

14 in jail, that may be a small amount of money.  I'm very

15 sympathetic to that, but it's not an insignificant amount of

16 money.

17            And I agree with Mr. Kelley that this will have --

18 if the defendant flees, it is going to have an impact on his

19 future.  It's going to impact where he can travel if there

20 is a fugitive warrant for this defendant, especially if his

21 --

22            The Government has at least suggested in their

23 arguments there may be a great deal more here than simply

24 false statements to Customs & Border Patrol agents.

25            Let me address separately this argument about the

1 J-1 Visa.  Let's assume he, as I think everyone is operating

2 on, that he's going to lose the sponsorship of Harvard and

3 his participation in research.  Let's assume that it's going

4 to jeopardize his J-1 Visa, and let's assume if it's

5 revoked, he's going to be here illegally.

6          Immigration agents could detain him and then

7 initiate deportation and removal proceedings.  The argument

8 by the Government is all that could be done before criminal

9 proceedings could be concluded.  This is certainly possible.

10          However, I think the burden in that case is on the

11 Government.  The two agencies need to talk to each other.

12 If the Government wants to proceed with the prosecution, the

13 Justice Department needs to speak to one of its components,

14 ICE, to say you've picked up this guy, we want to prosecute

15 him, and they could apply to this Court for authorization to

16 detain the defendant pretrial because of changed

17 circumstances.

18          In my view that strikes the right balance, at

19 least at this point.  And even if ICE is going to move

20 quickly on deportation or removal perhaps because a

21 defendant cooperates with that and wants to be deported or

22 removed, it seems to me that could be handled quickly

23 enough.

24          I recognize there are circumstances where the

25 right hand doesn't know what the left hand is doing, but the

1 prospect that ICE may take action if the J-1 Visa is revoked

2 if he loses his job is not sufficiently strong here or

3 there's not -- it's not that there's not another remedy in

4 my view; that there is, and so it's not dispositive on the

5 issue of release.

6          I think that's all I wanted it address in my

7 remarks.

8          So I'm going to release the defendant once these

9 conditions are satisfied.

10          The defendant's not going to be released until

11 money is posted.

12          The defendant will reside at his current address.

13 In other words, he will go back to the apartment at 400

14 Brookline Avenue, Unit 8A, in Boston, and he will reside

15 there until December 31.

16          On that date he will reside in the apartment of

17 his uncle, which information shall be given to Pretrial

18 Services before the defendant is released.

19          I will entertain a motion if there's another

20 address that is as appropriate on December 31.  We can cross

21 that bridge when we get there.  But in the absence of that,

22 the defendant goes from Brookline Avenue to the uncle's

23 address which right now is the only description I have is

24 outside the Broadway Station.  And if I were releasing the

25 defendant today to that location, that would not be

34

1 sufficient.

2          The defendant is going to sign a $100,000

3 performance and appearance bond that is to be secured by

4 $15,000 in cash.  He's not going to be released until that

5 money is posted.

6          Mr. Zheng, I'm going to say this again when I go

7 through your conditions.  If you violate any condition of

8 release, the $15,000 is going to be forfeited, and the

9 United States is going to go after you for the additional

10 $85,000.

11          All right.  So with that, I'm going to go through

12 the conditions of release unless -- let me just --

13          Do you want me to just put this over until the

14 money is posted and we come back to court, and I will

15 release the defendant with that posted, or do you want me to

16 do these conditions provisionally, and the defendant could

17 be released when the bond is signed and the $15,000 in cash

18 is posted?  I'm happy to do either.

19          MR. KELLEY:  My suggestion, Judge, would just be

20 to provisionally do it.

21          THE COURT:  Okay.

22          MR. KELLEY:  And that way we don't have to

23 reconvene the parties.

24          THE COURT:  All right.

25          Mr. Tolkoff, does that work for you?  I know this

1 is over the Government's objection, but.

2          MR. TOLKOFF:  That's fine, Your Honor.

3          THE COURT:  Okay.

4          MR. TOLKOFF:  Can we get some sense from Mr.

5 Kelley about when that might be?

6          MR. KELLEY:  I don't anticipate it would take a

7 long time, Judge.  A day or two, at most.

8          THE COURT:  He's not getting released until it's

9 posted.  And I'm available in Boston tomorrow and in

10 Worcester thereafter if something comes up.

11          All right.  Mr. Zheng, I want you to remain

12 seated.  I'm going to go through the conditions of your

13 release.  You are to comply with these conditions.  I

14 recognize you're well educated.  This is probably not going

15 to be a difficult thing for you to understand, but it's

16 important that you understand these conditions.  And if you

17 don't, ask a question now.  If you violate a condition and

18 come back to Court and say I didn't understand the

19 conditions, I'm not going to accept that as an excuse, and

20 you're going to be detained, so it's important that you

21 understand these conditions.

22          The defendant, Zaosong Zheng, is released subject

23 to the following conditions:

24          The defendant shall not commit an offense in

25 violation of federal, state or local law while on release on

36

1 this case;

2        The defendant must cooperate in the collection of

3 a DNA sample if it is authorized by law;

4        The defendant shall immediately advise the Court,

5 Pretrial Services, defense counsel and the United States

6 attorney in writing before any change in his address and/or

7 telephone number;

8        If you get a new telephone because your phone was

9 taken from you, you are to provide that telephone number to

10 Pretrial Services, to your lawyer and to the United States;

11        The defendant shall report as soon as possible but

12 no later than 24 hours after to the Pretrial Services

13 office;

14        Any unauthorized contact with any law enforcement

15 personnel, including but not limited to any arrest,

16 questioning or traffic stop -- so if a police officer simply

17 asks you questions about something.  It may have nothing to

18 do with you, you go on your way and the officer goes on his

19 way -- you have an obligation to report that contact to

20 Pretrial Services;

21        The defendant shall appear at all proceedings as

22 required and shall surrender for service of any sentence

23 that may be imposed in this case;

24        The defendant shall execute a $100,000 bond that

25 is to be secured by $15,000 in cash, and the defendant will

1  not be released until that cash has been posted and the bond

2  has been signed;

3          The defendant shall report to Pretrial Services as

4  directed.

5          Do we have all of the defendant's passports?

6          MR. TOLKOFF:  His passport was seized on December

7  10, Your Honor.

8          THE COURT:  All right.

9          MR. TOLKOFF:  If he has other travel documents,

10  we're not aware of them.

11          THE COURT:  All right.  You're not to apply for

12  another passport.  You're not to have someone else apply for

13  a passport on your behalf.

14          Your travel is restricted to Boston.  You're not

15  to leave the City the Boston.

16          You are to reside at 400 Brookline Avenue, Unit

17  8A, Boston, Massachusetts, until noon on December 31st of

18  2019, and then you are to immediately go to the address of

19  your uncle.

20          You are not to be released until the address of

21  your uncle has been provided to Pretrial Services, your

22  lawyer and the Government, and then you are to reside at

23  that address.

24          As I indicated, if before that date there is

25  another address that is more appropriate for release, the

38

1  Court will consider that, but consider is all I will do --

2  commit to right now.

3        You're to avoid all contact, direct or indirect,

4  with any person who is or may become a victim or a potential

5  witness in this investigation or prosecution.  That includes

6  anyone that may work at the Wenyi Wei Lab.

7        And if I'm not pronouncing that correctly, let me

8  know if you don't know what I'm talking about.  The Wenyi

9  Wei Lab.  Do you understand what lab I'm talking about?

10        THE DEFENDANT:  It was inside B.I. hospital.

11        THE COURT:  Yes.  The lab that you were working at

12  at Beth Israel Deaconess Medical Center.  You're to have no

13  contact with any person who works there.  Mr. Kelley will

14  take care can of an investigation on your behalf.

15        MR. KELLEY:  Your Honor, I apologize.  I don't

16  mean to interrupt the Court, but Mr. Zheng's roommate works

17  at that lab, so I don't know how workable that condition

18  might be.

19        THE COURT:  You're obviously going to have contact

20  with your roommate.  You're not to discuss this case.  If

21  your roommate asks about it, you say the judge told me I

22  can't talk about it.

23        You're prohibited from possessing a firearm,

24  destructive device or a dangerous weapon.

25        You are to refrain from the excessive use of

1 alcohol.

2          You're prohibited from possessing and/or using a

3 narcotic drug or other controlled substance unless it is

4 prescribed by a licensed medical practitioner.

5          And I realize this may not be particularly

6 relevant to your case, but that includes marijuana.  Ignore

7 what the law is in Massachusetts.  You are on federal

8 pretrial release, and you're not to possess or use marijuana

9 along with any other controlled substance or narcotic drug,

10 unless it's prescribed by a doctor or someone else who has a

11 license to prescribe controlled substances.

12          You will be on home detention, and that means you

13 are to be in the residence at all times except as

14 preapproved by Probation and Pretrial Services for Court

15 purposes, meetings with counsel, medical or mental health

16 treatment or religious services or if there's some other

17 preapproved activity.

18          You're not being approved by employment, certainly

19 not at this point, so that's not going to be a reason for

20 you to leave your residence.

21          Because you're going to be on home detention, I'm

22 going to sign a warrant for your arrest.  It will be held in

23 abeyance.  If Probation notifies the Court that you are not

24 where you're supposed to be, the warrant is going to go into

25 the system, and it will authorize anyone to arrest you.

40

1          The defendant's compliance with home detention

2 will be through location monitoring.

3          Do we know that the residence is appropriate for

4 location monitoring?

5          THE PROBATION OFFICER:  Your Honor, no home

6 inspection has been conducted as of yet.  If there's a delay

7 with the securing of the bond, there may be time for us to

8 do that.

9          THE COURT:  Let's do a home inspection, and the

10 defendant -- his release is subject to the home inspection

11 and assurance that location monitoring, whether it's cellar

12 or conventional radio frequency, make sure that that can be

13 done at that residence.

14          THE PROBATION OFFICER:  Yes, Your Honor.

15          THE COURT:  The defendant shall be required to pay

16 for or contribute to the cost of monitoring based on his

17 ability to pay and the availability of third-party payment.

18          I think that's what I have for conditions.

19          Ms. Walls, I'll start with you.  Anything else?

20          THE PROBATION OFFICER:  No, Your Honor.  I think

21 that covers everything.

22          The only question we would have is that does Your

23 Honor have a preference whether the location monitoring is

24 radio frequency or GPS?  GPS has been technology that allows

25 us to know where the person is at all times and to restrict

41

1  -- to create exclusion zones such as airports.

2           THE COURT:  Let's do GPS and have an exclusion for

3  --

4           What airports can we enter?

5           THE PROBATION OFFICER:  You've limited him to the

6  Boston --

7           THE COURT:  Yes.

8           THE PROBATION OFFICER:  -- to Boston, so we can

9  exclude --

10          Logan Airport I believe --

11          THE COURT:  Okay.

12          THE PROBATION OFFICER:  -- is the only airport

13 that's within the city limits.

14          THE COURT:  All right.  Thank you.

15          THE PROBATION OFFICER:  I believe.

16          THE COURT:  That's what we'll do.  GPS monitoring

17 with the exclusion zone of Logan Airport.

18          Mr. Tolkoff, I know this is over the Government's

19 objection, but just on the conditions themselves, anything?

20          MR. TOLKOFF:  No.  Thank you, Your Honor.

21          THE COURT:  All right.  And Mr. Kelley?

22          MR. KELLEY:  Not at this time, Judge.

23          THE COURT:  Okay.  Mr. Zheng, I'm required to give

24 you certain warnings, and I'm going to give those warnings

25 to you now.

1          A violation of any of the forgoing conditions may

2  result in the issuance of a warrant for your arrest, a

3  revocation of your release on conditions, an order of

4  detention, a prosecution for contempt of court, the

5  surrender of $15,000 in cash, the United States going after

6  you for the sum of $85,000.

7          In addition, if you fail to appear in Court as

8  required or if you fail to surrender for service of a

9  sentence, you face a consecutive sentence for what we call

10 bail jumping, and if you're convicted of bail jumping, you

11 would face up to five years in jail and a $250,000 fine.

12         You will note that the very first condition of

13 your release is that while on release you're not to commit a

14 crime in violation of federal, state or local law.  If you

15 were to do so, and if you were convicted of a separate

16 offense of committing a crime while on release, you would

17 face the following consecutive penalties:  not more than 10

18 years in jail if the crime you committed on release was a

19 felony, not more than 1 year in jail if the crime that you

20 committed while on release is a misdemeanor.

21         Finally, four other laws govern your behavior

22 while on release.  It's a felony punishable by imprisonment

23 and a fine to intimidate or attempt to intimidate a witness,

24 a victim, an informant, a cooperating witness, a court

25 officer or a juror.  It is a felony punishable by

43

1  imprisonment and a fine to obstruct any criminal

2  investigation by preventing, delaying or obstructing or

3  trying to prevent, delay or obstruct the communication of

4  information to a law enforcement officer.  It's a felony

5  punishable by imprisonment and a fine to tamper with a

6  witness, a victim or an informant.  And finally, it is a

7  felony punishable by imprisonment and a fine to retaliate

8  against a witness, a victim or an informant by causing

9  bodily injury or property damage or threatening or

10 attempting to do so.

11         I don't expect any of these things are going to

12 happen, but the reason I'm required to give you these

13 warnings is because the consequences are so serious.

14         Do you have any question about anything about your

15 release?

16         THE DEFENDANT:  No questions.

17         THE COURT:  All right.  So here's what's going to

18 happen.  We are going to print a copy of the conditions of

19 your release for you when you're going to be released.  You

20 will sign them.  You'll take a copy of those conditions with

21 you so that you have them.  Your release is subject to the

22 address where you're going to be living starting in the

23 afternoon of December 31 being provided to Pretrial

24 Services, the Government and your lawyer, and it's going to

25 be subject to your posting $15,000.  Once those things are

44

1  done, the defendant can be released.

2          I don't think there's a reason for us to

3  reconvene, although I'm certainly available if that needs to

4  be done.

5          Mr. Tolkoff, do you want -- are you moving to stay

6  my release order for an opportunity to consider an appeal?

7          MR. TOLKOFF:  With respect to the Court, yes, Your

8  Honor.  I've been instructed to do so.

9          THE COURT:  All right.

10         MR. TOLKOFF:  If the Court is willing to stay it

11  at least until close of business tomorrow afternoon.

12         THE COURT:  Okay.

13         MR. TOLKOFF:  Thank you, Your Honor.

14         THE COURT:  Mr. Kelley, anything on that?

15         MR. KELLEY:  I would just object, Judge.

16         THE COURT:  Okay.  I'm going to grant that motion.

17         So even if everything is posted, the defendant is

18  not to be released basically until Friday morning, so that

19  the Government has an opportunity to consider whether to

20  take an appeal of the Court's decision.

21         Okay.  I appreciate everybody's efforts to bring

22  together all this information, especially Pretrial Services

23  which is working under a very heavy case load.

24         Mr. Tolkoff, anything else?

25         MR. TOLKOFF:  No.  Thank you, Your Honor.

*Judy Bond, CERT*
*Certified Federal Court Transcriber*
*judy@bondcourtreporting.com*

45

1          THE COURT:  And Mr. Kelley, anything else?

2          MR. KELLEY:  Nothing at this time, Judge.

3          THE COURT:  Okay.  We're in recess.

4          Thank you, Mr. Interpreter.

5      (Court adjourned at 10:21:52 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATION

2      I, Judy Bond, a court approved transcriber, certify

3 that the foregoing is a correct transcript from the official

4 electronic sound recording of the proceedings in the

5 above-entitled matter.

6

7

8 _____ January 26, 2020
   Judy Bond
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Judy Bond, CERT*
*Certified Federal Court Transcriber*
*judy@bondcourtreporting.com*